LYNN J. FALKENTHAL, Plaintiff-Appellant and Cross-Appellee, *v.* PUBLIC BUILDING COMMISSION OF CHICAGO *et al.*, Defendants-Appellees and Cross-Appellants.

First District (4th Division) No. 81—1970

Opinion filed December 2, 1982.—Rehearing denied January 27, 1983.

Maurice J. McCarthy, of Chicago, for appellant.

J. Richard Jackson, of Osterkamp, Jackson & Hollywood, of Chicago, for appellee Public Building Commission of Chicago.

Hugh R. McCombs, Jr., Bruce D. Becker, and Carol R. Stone, all of

Isham, Lincoln & Beale, of Chicago for appellees C. F. Murphy Associates, Inc., Skidmore, Owings & Merrill, and Loebl, Schlossman, Bennett & Dart.

JUSTICE ROMITI delivered the opinion of the court:

This appeal arises out of a complaint for personal injuries allegedly suffered by plaintiff, Lynn J. Falkenthal, when she was struck on the forehead by a telephone booth door which opened into her path as she walked down the concourse connecting the Richard J. Daley Center to the Brunswick Building in Chicago. Named as defendants were: Public Building Commission of Chicago, owner of the Daley Center; Frank M. Whiston & Co., manager of the building; Eleanor White, who opened the door which struck plaintiff; Illinois Bell Telephone Company, owner of the telephone booth; and three architectural firms involved in the design of the booth, Skidmore, Owings & Merrill; Loebl, Schlossman, Bennett & Dart; and C. F. Murphy Associates. Illinois Bell was dismissed from the case prior to trial, the trial judge entered a directed verdict for Eleanor White at the close of plaintiff's case, and the jury found for Frank M. Whiston & Co. The jury returned a verdict in the amount of $1,079.50 in favor of plaintiff and against the remaining defendants and judgment was entered on that verdict. The trial court also awarded $6,845.61 to plaintiff for costs.

Plaintiff has appealed from the amount of the judgment and seeks a new trial on the issue of damages, contending: (1) the trial court erred in permitting defendants to adduce evidence relating to head injuries sustained by plaintiff prior to and after the injury at issue; (2) the trial court erred in failing to give three instructions relating to the possibility that the earlier injury sustained by plaintiff was an additional or contributing cause of the narcolepsy which plaintiff asserted was caused by the blow from the door; and (3) the trial court erred in giving a misleading interrogatory to the jury. Defendants have cross-appealed from the order awarding costs, asserting that under Illinois law many of the items on which the award was based were not recoverable as costs.

We affirm the judgment entered on the jury's verdict but reverse the trial court's order awarding costs and remand the cause for a new hearing on that issue.

The pertinent facts adduced at trial were as follows. On January 22, 1975, plaintiff was walking down the concourse between the Daley Center and the Brunswick Building when a telephone booth door suddenly opened into her path, striking her on her forehead above the right eye. Eleanor White, the occupant of the telephone booth, assisted her in walking to the first-aid room in the Daley Center where

the bleeding was stopped and a butterfly bandage was applied to the cut. Plaintiff then lay down until her employer arrived to drive her home. Plaintiff suffered headaches through the night. The next day, after experiencing blurred vision and a continuing headache, she went to a hospital emergency room where she was treated by Dr. William Woodward. X rays taken at his request produced no sign of a fracture.

After this occurrence plaintiff began to experience two physical symptoms which persisted until the time of trial. She would suffer from uncontrollable urges to fall asleep and on other occasions she would lose the strength in her muscles and collapse. In May 1976 plaintiff consulted Dr. Richard Nilges about these symptoms. Dr. Nilges was board-certified in neurological surgery and was a member of the American Association of Neurological Surgeons, the Congress of Neurological Surgeons, and the Chicago Neurological Society among other professional medical organizations.

It was Dr. Nilges' opinion, based upon a reasonable degree of medical certainty, that plaintiff suffered from narcolepsy (attacks of sleepiness) and the associated condition of cataplexy (uncontrollable loss of muscle control) caused by the blow to her head from the telephone booth door. He based his opinion on plaintiff's statement that the attacks first started after she received the blow and her description of having suffered amnesia shortly after the injury. This latter fact indicated to the doctor that plaintiff suffered a concussion which could have disturbed the reticular formation of the brain (that part of the brain controlling wakefulness and sleep) and produced the conditions of narcolepsy and cataplexy.

Dr. Nilges had treated 14 other patients for narcolepsy and he testified that none of those cases was caused by cerebral trauma. He also stated that none of the 6,000 cases of head trauma he had treated in his career had resulted in narcolepsy. The only scientific literature cited by Dr. Nilges in support of his opinion that narcolepsy could be caused by a blow to the head was a textbook on neurology stating that in rare instances narcoleptic states may accompany cerebral trauma. However, that treatise also stated that the cause of true narcolepsy was unknown.

Dr. Harold Klawans testified for defendants. He was senior attending neurologist, associate chairman of the department of neurological sciences, and professor of neurological sciences at Rush-Presbyterian-St. Luke's Hospital in Chicago. He testified that he had written or edited over 30 books and had written over 200 articles, all in the field of neurology. A number of these writings concerned narco-

lepsy.

Dr. Klawans described narcolepsy as an idiopathic disease consisting of four separate disease components: narcoleptic attacks, which are attacks of irresistable sleep; cataplexy, which is a sudden loss of muscle tone resulting in loss of the use of that muscle; sleep paralysis, in which the patient is awake but cannot move his arms or legs; and hypnogogic hallucinations, the experience of very vivid, well-recalled hallucinations. According to Dr. Klawans, a patient could have one or two or a mixture of these components.

It was Dr. Klawans' opinion, based on three separate types of medical evidence, that trauma cannot cause narcolepsy. First, because narcolepsy is a highly sophisticated and organized expression of physiological activities of the brain, it could not be caused by trauma, which he described as a "crude insult to the nervous system" which could destroy but not cause the complex reorganization of activity involved in narcolepsy. Secondly, in the approximately 1,000 cases of head trauma he had treated he had never observed narcolepsy to result. Thirdly, scientific studies of large groups of patients with head trauma, including one study of 1,000 consecutive patients, had resulted in the conclusion that none of those patients had narcolepsy related to trauma. Finally, Dr. Klawans noted that in the various treatises on head trauma no mention was made of narcolepsy because it had not been demonstrated to be caused by such trauma.

Dr. Klawans had examined plaintiff and concluded that she could well have narcolepsy but he would like further diagnostic tests to be sure. He also testified that patients usually become aware of the symptoms of narcolepsy between the ages of 15 and 30. Plaintiff was 24 years old at the time of the incident in question.

I

Plaintiff first contends that the trial court erred in permitting defendants to adduce evidence concerning two automobile accidents, one in 1973 and one in 1977, in which plaintiff received blows to the head.

Prior to trial the court denied plaintiff's motion *in limine* to exclude evidence of these accidents as well as evidence of an electromyelogram taken of the plaintiff in relation to the earlier accident. At trial plaintiff testified that in the 1973 accident she injured her neck, ear, shoulder and hip and bruised her cheek. She also experienced a tingling, cold sensation in her left hand, but could not recall whether the sensation persisted up to the time of her Daley Center injury. Plaintiff admitted that as the result of the shoulder injury she could

not swim or play tennis a week before the Daley Center accident. Plaintiff also testified that she hit her forehead in the 1977 accident.

Dr. Nilges testified that when he first examined plaintiff she did not inform him of the head injuries she received from the 1973 accident. However, because there was no evidence of any significant injury to the brain from this accident and because plaintiff's symptoms did not occur until after the Daley Center accident, it was Dr. Nilges' opinion that the 1973 accident did not cause plaintiff's narcoleptic condition. Dr. Nilges also testified that after the 1977 accident plaintiff experienced numbness and tingling in the arms and legs. He attributed this to involvement of the nervous system, but not at the brain level. It was his belief that the 1977 accident and the injuries associated with it did not affect plaintiff's narcoleptic condition.

■ Plaintiff contends that the evidence of these other injuries was improper because no connection to the Daley Center injury was established, citing *Marut v. Costello* (1964), 53 Ill. App. 2d 340, 202 N.E.2d 853, *aff'd* (1966), 34 Ill. 2d 125, 214 N.E.2d 768, and *Khatib v. McDonald* (1980), 87 Ill. App. 3d 1087, 410 N.E.2d 266. But those cases involve the admission of evidence that a plaintiff suing because of injury to one area of the body was previously injured in another area. Thus in *Marut* the plaintiff, in a suit based on claimed injuries to her lower back, was held to have been improperly cross-examined about injuries she sustained to her neck two years earlier. Similarly in *Khatib*, where the plaintiff claimed injury to his back and leg, it was held error for the trial court to permit him to be questioned concerning a prior injury to his shoulder. In this cause it was plaintiff's theory that as the result of a blow to the head she developed narcolepsy. The other two accidents also had caused injuries to her head. Thus this case more closely resembles that of *Vandermyde v. Chicago Transit Authority* (1979), 73 Ill. App. 3d 984, 392 N.E.2d 48, where the reviewing court held that it was improper to bar defendants from questioning the plaintiff about a prior back injury when his claim was based on an alleged injury to his back.

We would also note that the plaintiff also claimed that as a result of her injuries from the Daley Center accident she was unable to engage in such activities as swimming and tennis. As we have noted, defendants were able to adduce from her the admission that injuries from the 1973 accident prevented her from engaging in these activities as late as one week before the Daley Center accident. Thus that earlier accident was relevant to the question of the extent to which her curtailed activities could be solely attributed to the Daley Center accident. For these reasons we find no error in the trial court's ruling

on this evidence.

## II

■ At the instructions conference plaintiff tendered three instructions which she now contends related to the possibility that the 1973 accident was an additional or contributing cause of plaintiff's narcolepsy.

The relevant portions of the instructions submitted were as follows:

"Negligence—Intervention of Outside Agency

If you decide that the defendants were negligent and that their negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury." (Illinois Pattern Jury Instruction, Civil, No. 12.05 (2d ed. 1971) (hereinafter cited as IPI Civil).)

"Proximate Cause—Definition

When I use the expression 'proximate cause', I mean that cause which, in natural or probable sequence, produced the injury complained of.

[It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it causes the injury.]" (IPI Civil No. 15.01.)

"If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate her for any of the following elements of damage proved by the evidence to have resulted from the negligence of the defendant:

The aggravation of any pre-existing ailment or condition." (IPI Civil Nos. 30.01, 30.03.)

The trial court refused all of No. 12.05, the bracketed portion of No. 15.01, and the last sentence of No. 30.03.

We find no merit to plaintiff's contention that this was error because we find that an examination of the totality of the evidence provides no support for the theory that the 1973 accident caused or contributed to plaintiff's narcolepsy. It was plaintiff's contention at trial that the sole cause of plaintiff's narcolepsy was the blow to the head she suffered in the Daley Center accident. Her expert medical witness, Dr. Nilges, specifically testified that the other accidents did not cause or contribute to her condition. And defendants' expert medical witness, Dr. Klawans, testified unequivocally that narcolepsy could not be caused by any blow to the head. Clearly whether the jury ac-

cepted plaintiff's theory or that of defendants they could not have found that the other accidents contributed to the causation of plaintiff's narcolepsy.

Although a party has a right to have the jury instructed on his theory of a case provided there is a sufficient evidentiary basis for the instruction (*Perry v. Chicago & North Western Transportation Co.* (1977), 54 Ill. App. 3d 82, 369 N.E.2d 155; *Wrighthouse v. Brown* (1964), 52 Ill. App. 2d 191, 201 N.E.2d 752), it is reversible error for the court to instruct the jury on an issue not supported by the evidence (*Shore v. Turman* (1965), 63 Ill. App. 2d 315, 210 N.E.2d 232). In *Shore* the plaintiff sued for injuries arising out of an automobile accident. Evidence was introduced at trial that the plaintiff drank several bottles of beer several hours before his accident. However, all the witnesses on the subject also testified that he was not intoxicated. On these facts the appellate court held that it was reversible error for the trial court to instruct the jury on intoxication and its legal effect on due care because there was an insufficient factual foundation to support those instructions. In this cause we have held that the trial court properly refused to bar defendants from introducing evidence of other head injuries suffered by plaintiff where the condition was alleged to have been caused by such an injury. But when at the close of all the evidence it became clear that there was no testimony suggesting that those other injuries were related to that condition, it would have been error for the trial court to instruct the jury on such a causal theory. Accordingly, we find that the trial court properly refused the instructions at issue.

### III

Finally, plaintiff contends that it was error for the trial court to submit the following special interrogatory, requested by defendants, to the jury:

"The jury is instructed to answer the following interrogatory 'Yes' or 'No':

If plaintiff is suffering from narcolepsy, was that condition proximately caused by the blow to the head which she received on the lower concourse area of the Daley Center on January 22, 1975?"

The jury responded "No."

At the instructions conference plaintiff objected to this interrogatory solely on the ground that it duplicated instructions already given to the jury. Only after the jury reached its verdict did plaintiff contend, as she does on appeal, that it was improper because it could

not control the general verdict, was misleading and confusing to the jury, and the jury's answer to it was subject to a number of varying interpretations. Special interrogatories must be tendered, objected to, ruled upon and submitted to the jury in the same manner as are instructions (Ill. Rev. Stat. 1979, ch. 110, par. 65) and thus specific objection to special interrogatories must be made at the instructions conference (Supreme Court Rule 239(b), 73 Ill. 2d R. 239(b); *Casbarra v. St. James Hospital* (1979), 85 Ill. App. 3d 32, 406 N.E.2d 544). Because none of the contentions now raised by plaintiff were raised by her at the instructions conference, she has waived them. *Delany v. Badame* (1971), 49 Ill. 2d 168, 274 N.E.2d 353; *Migliore v. County of Winnebago* (1974), 24 Ill. App. 3d 799, 321 N.E.2d 476; see *Fontanne v. Federal Paper Board Co.* (1982), 105 Ill. App. 3d 306, 434 N.E.2d 331.

## IV

In her post-trial motion plaintiff included a request for costs in the amount of $6,845.61. The trial court granted this request *in toto* and defendants have cross-appealed from that order.

It is well established in Illinois that as costs were not recoverable at common law only those costs specifically designated by statute are recoverable by a prevailing party to a lawsuit. (*Galowich v. Beech Aircraft Corp.* (1982), 92 Ill. 2d 157; *Ritter v. Ritter* (1943), 381 Ill. 549, 46 N.E.2d 41.) Thus attorney fees and the ordinary expenses of litigation are not allowable to a successful party as costs absent specific statutory authority or agreement by the parties. (*Meyer v. Marshall* (1976), 62 Ill. 2d 435, 343 N.E.2d 479.) Moreover, because costs statutes are in derogation of the common law they are to be strictly construed. (*Department of Revenue v. Appellate Court* (1977), 67 Ill. 2d 392, 367 N.E.2d 1302.) Yet in this cause the sole statutory authority cited by plaintiff in support of the costs she requested and received is section 7 of the costs statute (Ill. Rev. Stat. 1979, ch. 33, par. 7). That statute authorizes the award of costs to a successful litigant in general terms but it does not in itself specify what items of costs are allowable. *Galowich v. Beech Aircraft Corp.* (1982), 92 Ill. 2d 157.

■■ ■ In addition to plaintiff's failure to provide to either the trial court or this court specific statutory authority for the costs she received, it is apparent from the record that plaintiff was not entitled to some of the specific items of costs she was awarded. For example, she received $862.50 for Dr. Nilges' "time" and $3,000 for the "time" of Henry Mikolajcyk, plaintiff's expert architect. These amounts ap-

pear to represent in great part the fees charged by these expert witnesses. But in the absence of statutory authority experts' fees are not taxable as costs. (*In re Estate of James* (1956), 10 Ill. App. 2d 232, 134 N.E.2d 638; see *Hutchinson v. Hutchinson* (1894), 152 Ill. 347, 38 N.E. 926.) Expert witnesses, like other witnesses, normally are only entitled to $20 per day and 20 cents per mile of necessary travel and even those amounts must be documented by affidavits from the witnesses. (Ill. Rev. Stat. 1979, ch. 53, par. 65; 73 Ill. 2d R. 208.) No such documentation is contained in this record. Other costs awarded to plaintiff apparently related to deposition expenses, but such expenses are only permitted to the extent they relate to depositions necessarily used at trial. (*Galowich v. Beech Aircraft Corp.* (1982), 92 Ill. 2d 157.) Plaintiff's only representation to the trial court concerning this was that the depositions at issue were discovery depositions.

On this record we could only speculate as to what portion of the costs awarded was proper. Accordingly, we vacate that award and remand the cause to the trial court for further proceedings in which the court may determine what costs, properly documented and supported by statute or court rule, will be awarded.

The judgment of the trial court is affirmed in all respects except for the order awarding costs, which is vacated, and the cause is remanded for further proceedings consistent with this opinion.

Affirmed in part, vacated in part, and remanded.

JOHNSON, P.J., and LINN, J., concur.