JEFFREY K. WILSON, Plaintiff-Appellee, v. GRANITE CITY STEEL DIVISION OF NATIONAL STEEL CORPORATION, Defendant-Appellant.

Fifth District    No. 5—90—0388

Opinion filed February 14, 1992.—Rehearing denied April 16, 1992.

GOLDENHERSH, P.J., dissenting.

Churchill, McDonnell & Hatch, of Belleville (Joseph B. McDonnell, of counsel), for appellant.

Robert William Bosslet, Jr., of Morris B. Chapman & Associates, Ltd., of Granite City, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

The plaintiff, Jeffrey K. Wilson, brought suit against the defendant, Granite City Steel Division of National Steel Corporation, for damages occasioned when he slipped and fell at the defendant's manufacturing plant while picking up an order of steel coils. A jury found that the total amount of damages suffered by the plaintiff was $475,356, itemized as follows: disability and disfigurement, $50,000; pain and suffering, $20,000; medical expenses, $12,720; and loss of earnings, $392,636. The jury found further that the percentage of negligence attributable solely to the plaintiff is 5%. Reducing the total damages by that amount, the jury assessed plaintiff's recoverable damages in the sum of $451,588.20. The trial court denied the defendant's post-trial motion. The defendant appeals, presenting four issues for review: (1) whether the trial court improperly restricted defendant's cross-examination of the plaintiff with respect to three matters, namely, a prior injury, a suit filed in connection with that injury, and testimony given by plaintiff and his treating physician in that suit; (2) whether the trial court improperly refused to allow the defendant to present evidence depositions of physicians who had treated or evaluated plaintiff in connection with the earlier injury; (3) whether plaintiff's counsel improperly circumvented the trial court's ruling *in limine* concerning plaintiff's prior felony conviction; and (4) whether the closing argument of plaintiff's counsel was prejudicial.

In the instant case, prior to the commencement of jury selection in the trial had in February of 1990, the defendant sought to present by evidence deposition, scheduled to be taken later that same day, the testimony of Dr. Richard Wan of Morgantown, Kentucky, who had treated the plaintiff for back and left-knee injuries he had sustained in an automobile accident in July of 1983. The suit arising out of this ac-

cident, Jeff Wilson v. Mark Eversole, Civil Action No. 84—CI—105, was tried in September of 1985 in the Muhlenberg Circuit Court of the Commonwealth of Kentucky. The defendant in the instant suit sought as well "to present certain of the testimony of the Plaintiff, himself, given in the early case in which he described the condition of his knee, the pain that it was giving him, the disability that he had, [and] the inability that he had to engage in any meaningful activity, including work." The defendant sought, in the alternative, to introduce Dr. Wan's testimony given at the previous trial, thereby obviating the need to take Dr. Wan's deposition that same day. Thus, the defendant asked the court to rule that it be allowed to introduce the testimony of Dr. Wan in the previous trial as a part of the defense of the instant case "on the theory of an admission on the part of the Plaintiff concerning his physical condition."

The plaintiff argued that as a result of the slip and fall on the defendant's premises on August 31, 1987, he had sustained a tear of the posterior cruciate ligament of the left knee, which ligament had been unaffected by the automobile accident on July 22, 1983. The plaintiff took the position that because the posterior cruciate ligament of the left knee was not injured in the automobile accident of 1983, evidence concerning the injury to another part of the plaintiff's left knee sustained in that accident was inadmissible. The plaintiff expressly stated that "[w]e are not talking about an aggravation of an earlier injury" but about "a separate, distinct injury." The trial court denied the motion with respect to the use of Dr. Wan's testimony in the prior case.

Concerning the use of Dr. Wan's deposition, if it were taken later that same day, the defendant stated, "Your Honor, in view of the Court's ruling, then, I take it that any attempt to take the evidence deposition of Dr. Wan would be futile, since the Court's ruling is based upon the absence of any apparent indication that the injury alleged in this case was considered by Dr. Wan and his testimony in the previous case." After some discussion the trial court expressed the view that whether the defendant wished to take Dr. Wan's evidentiary deposition that day was an "administrative decision" to be made by the defendant. Later, defense counsel advised the court, "We will forego the taking of the evidence deposition of Dr. Wan, in view of the Court's earlier ruling."

During consideration of further pretrial motions, the plaintiff moved orally that there be no reference to any previous left-knee injury because of a lack of any evidence of a torn posterior cruciate ligament associated with the prior injury. Earlier, the plaintiff had

moved *in limine* in writing that the trial court prohibit all references by the defendant to the prior litigation of his injury of July of 1983 "until such time as the Defendant shows to this court proper foundation for the use of said prior litigation for the purposes of impeachment with regard to a specific statement of Plaintiff or his witnesses." Thereafter the plaintiff sought to know "the Court's feeling about the prior incidents involving Mr. Wilson's knee, specifically the 1983 incident where he banged his knee into a dash when his cousin had an automobile accident." The court concluded that "the key determining factor in this case is whether or not the testimony relates to the specific injury; namely, the injury at hand, which is the torn posterior cruciate ligament in the left knee." The trial court expressed the further view that the test

"is simply whether there has been an opinion expressed that the injuries in 1983 may have affected the injury before us now, the torn posterior cruciate ligament, and if there is such an opinion that those injuries in 1983 may have affected the condition that we have now, the same body part condition, the posterior cruciate ligament, then that's all very fair game and is testimony which could and should come in for the jury to make a factual determination of whether, in fact, it did affect the torn posterior cruciate ligament."

The trial court expressed its preliminary ruling on the matter as follows:

"Unless there is an opinion from one of these treaters, 1983 treaters, or some other treater, for that matter, that there was a causal connection between what happened in 1983 and the torn posterior cruciate ligament, it is not fair game."

On direct examination the plaintiff testified in his own behalf that on August 31, 1987, he had injured his left knee when he slipped on grease and fell on the defendant's premises. The plaintiff, who was 32 years old at the time of trial and 6 feet 8 inches tall, indicated that he had gained 60 to 65 pounds after the incident in 1987, having weighed about 235 to 240 pounds for the 10 years preceding the event. He had gained this weight, he said, because "I ain't as active as I was. My leg keeps me from being active like I used to be. I could run and stuff. I can't now." He stated that after completing the eleventh grade in high school he had gone to work for his father, who ran a "backhoe business." He had operated a backhoe for his father and had helped his father on the latter's farm "[o]n and off until I got this job trucking," the job he held at the time of his injury on August 31, 1987. He had gone to California, he "believe[d]," in 1984, and had ob-

tained a job at Thrifty Warehouse, where he had worked as a stockperson for three weeks until, he said, he had been laid off. He stated that he had had a physical examination by a doctor prior to working at Thrifty Warehouse. Later he worked in California as a security guard for about three months before returning to his parents' home in Kentucky. Thereafter he went to Alliance Truck School for 30 days. About three weeks later he began to work as a truck driver for Power Leasing, where he was employed from approximately the middle of April of 1987 until he was injured on August 31, 1987. Prior to working for Power Leasing, he said, he had passed a physical examination.

The plaintiff testified that "[i]f I walk very far, it starts hurting, swelling up, but I can't walk on no uneven surfaces or ground or nothing like that at all." When asked, "What happens with your knee, Jeff, if you walk for any extended period of time?" he answered, "It feels like it wants to go out and give away on me." He has not, he said, been able to return to "trucking" since August 31, 1987. He indicated that as a result of the injury on that date he cannot ride a horse "[b]ecause I can't climb up and down off the saddle." Asked, "Have you tried helping your dad around the farm?" plaintiff responded:

"Yes, sir. I said to myself, I said, 'This can't be happening to me. I'm too young.' So, I went out and even tried to help him back on the backhoe. I tried to climb, and it started hurting me, and I would help him—one day the fence—we had a bull get through the fence. We had to tie it back up, and I went over then where the cows walk. They lay—they are pretty heavy, and they leave imprints in the ground where sometimes when it rains it gets muddy. They leave an imprint, and my leg was twisted around where it was unlevel, and I couldn't help him stretch the bobwire."

At the time of trial the plaintiff was working as a security guard.

On cross-examination the plaintiff reaffirmed that in 1984 he went to California and worked at Thrifty Warehouse. Thereafter, when the plaintiff was asked, "Now, as a matter of fact, isn't it true, Mr. Wilson, that in 1984 you were under a doctor's care for a knee problem?" he answered, "No, I don't think it was a knee problem. It was a back-strained my back." He stated that he remembered a Dr. Mark Crawford. Outside the presence of the jury the trial court heard argument concerning the wish of the defense to "show that [plaintiff] was not in California in '84" and to cross-examine the plaintiff concerning "his own description of his own injuries as sustained in the 1983 accident"

and "his own activity or lack of activity as a result of the 1983 accident." In sum, the defendant wished to question the plaintiff "about his prior physical condition which involves the same knee that is involved in this claim." The trial court ruled that "any questions about Dr. Crawford's treatment of the quote 'back or knee injury' as to what Dr. Crawford did or said is [*sic*] inappropriate." The trial court stated further that

> "[w]hat Dr. Crawford did or said might be offered by bringing forth Dr. Crawford to testify in this matter or by having Dr. Crawford testify by deposition as to the relationship between what he treated this man for and the accident which occurred, which is the subject of this lawsuit.
>
> I'm told, although I have not yet had an opportunity to review Dr. Crawford's deposition, that there is no linking of the conditions treated by Dr. Crawford to the injury sustained, which is the subject of this lawsuit. It is appropriate for [defense counsel] to impeach the defendant [*sic*] as to inappropriate dates if, in fact, the defendant [*sic*] has given, I'm sorry, the Plaintiff, if, in fact, the Plaintiff has given inappropriate dates, but it is not appropriate to do so by attempting to bootstrap that to things which are otherwise verboten.
>
> It is also appropriate to ask questions concerning the Plaintiff's well-being prior to the accident because there have been questions asked in Direct Examination as to the Plaintiff's well-being prior to the accident, which is the subject of this lawsuit.
>
> That, however, doesn't get into attempting to, or in fact getting into, diagnoses given by a physician, which is not, in some way, linked to the conditions that are the subject of this lawsuit."

Thereafter on cross-examination the plaintiff testified that in 1984 in Hopkinsville, Kentucky, he had seen a "bone doctor" whose first name was Mark. Asked, "Did you tell Dr. Crawford at that time that you had pain in the left knee?" plaintiff answered, "Yes, I had pain in both my knees." He admitted that the pain was the result of an automobile accident in Kentucky on July 22, 1983, in which he had struck his knees against the dashboard while a passenger in the front seat. After that accident plaintiff came under the care of Dr. Crawford. He denied having come under the care of any other doctors for the injury to the left knee. He admitted having told Dr. Crawford that the pain in his knee had started at the time of the automobile accident. Plaintiff testified that he did not remember telling Dr. Crawford that he was still complaining of pain in the left knee that had been going on

since the automobile accident on July 22, 1983; asked further, "Do you deny telling Dr. Crawford on November 12th, 1984, that you were complaining of pain in the left knee which you said had been going on since the time of the accident?" the plaintiff answered, "No, I don't deny that." The plaintiff admitted that Dr. Wan treated him for the left-knee injury on and after August 9, 1984, and that Dr. Wan sent him to have an arthrogram of the left knee. The plaintiff "guess[ed]" that the arthrogram was performed in September of 1985. The plaintiff admitted having seen Dr. Stanley Collis, an orthopedic surgeon in Louisville, Kentucky, and "guess[ed]" that he had told Dr. Collis on September 9, 1985, that his left knee was painful and swelled from time to time.

Upon further cross-examination the following questions were asked by defense counsel and the following answers were given by plaintiff:

"Mr. Wilson, what was your employment in 1983? Did you work in 1983?

A. 1983 I helped my dad on the farm and helped him with the backhoe and everything.

Q. When the accident happened in July of '83, did you work after that?

A. Yes, sir, sure did.

Q. That same year?

A. Yes, sir, the same year.

Q. Was that helping your dad on the farm?

A. Yes, sir, it was.

Q. With the backhoe?

A. Yes, sir.

Q. Did you—were you working in 1985, in 1984, excuse me, for your dad?

A. Yes, sir.

Q. Were you working in 1985 for your dad?

A. I believe that's when I went out to California; it was '85 or '86 when I went out to California.

Q. Isn't it a fact, sir, that you did not work at all from July 22nd, 1983, until at least the fall of 1985?

A. No, sir, that's not a fact. I worked.

Q. Did you ever state that you had not worked at all from July 22nd, 1983, until the fall of 1985?

A. I was off there for a little while.

Q. For how long?

A. From my back.

Q. For how long?

A. I don't remember how long.

Q. I'm talking about a period of some two years and three months?

A. No.

Q. Did you ever—

A. Not that long.

Q. You were never off work for that period of time?

A. No, sir.

\* \* \*

Q. Now, in this case, Mr. Wilson, you were given certain questions, written questions, to be answered by you and signed. Do you remember that, through your Attorney, Mr. Bosslet?

A. Yes, sir.

Q. I'm going to hand you the court file which contains a document which is headed 'Plaintiff's Answers to Interrogatories.' Do you see that?

A. Uh-hum.

Q. Does your signature appear at the end of that set of documents?

A. Yes, sir.

Q. And that's under an affidavit saying, 'Comes now the Plaintiff, Jeffery [sic] K. Wilson, and being first duly sworn on oath states he has read the Answers to Interrogatories prepared on his behalf, and that the same are true and correct'?

A. Uh-hum.

Q. That was subscribed by a notary public?

A. Yes.

Q. In those questions did you refer to this earlier accident that happened, and I'm quoting 'in approximately 1983' unquote?

A. Yes, sir.

Q. And in that answer did you state that you had bruised your left thigh?

A. Yes, sir.

Q. In fact, in that earlier accident, Mr. Wilson, you had injured your left knee; had you not?

A. That was the top, the very top of my knee. When that car hit us, it pushed me into the dash, and both my knees was bruised.

Q. Isn't it true that very night when you went home your left knee was throbbing and hurting to the point—

A. On top of my kneecap was.

Q. But you continued to complain of pain in that knee for over the next two years?

A. It wasn't that long. It was my back mostly kept hurting, not my knee.

Q. Didn't you complain as late as September of '85 you were still having pain in the left knee?

A. No, no, sir.

Q. Didn't you state, Mr. Wilson, in September of 1985 that you intended to have surgery on your left knee?

A. No, sir, I didn't. I don't never remember saying nothing like that.

Q. Do you recall being asked this question at that time September 17th, 1985, and giving this answer. 'Okay. Do you intend to have that surgery? Answer: Yes.'

A. No, I don't remember saying that.

Q. Did you have surgery before December of 1987 on the left knee?

A. No, no, sir.

Q. Did you intend to have any surgery before the accident of August 31, 1987, on the left knee?

A. No, sir.

Q. So, if you stated in September of 1985 that you were going to have surgery on the left knee that would be inaccurate?

A. I don't know what you are talking about. You asked me questions. I don't know what you are saying, have the surgery on my knee. There is nothing wrong with my knee to have surgery on; that doesn't have nothing to do with behind my leg.

Q. There was nothing wrong with your knee in '87?

A. That's what I'm saying."

At this juncture, outside the presence of the jury, defense counsel stated, "[I]n view of the witness's testimony that there was nothing wrong with his knee and his equivocal testimony with respect to statements made by him and inquired about on Cross-Examination I ask that the Court allow more detailed questioning with respect to the testimony given by the witness in a case styled *'Jeffery* [sic] *Wilson v. Mark A. Eversole, et al'* tried in the Muhlenberg Circuit Court in Kentucky in September of 1985 ***." Defense counsel thereupon enumerated several specific questions he wished to ask the plaintiff with respect to his testimony in that trial for purposes of impeachment. The trial court ruled as follows:

"Impeachment is the matter of an inconsistent statement or action given to issues that are material before the Court. The issue of whether this man ought to be prosecuted for lying in Hopkinsville, Kentucky[,] or not is not material to this Court, in any way, shape or form. It may well be relevant to the state's attorney in Hopkinsville or wherever this trial was, but it has no bearing, whatsoever, on these issues before this Court. This Court ruled earlier that the previous trial, and it didn't even need to rule that the previous trial is not fair game, and whether he filed a lawsuit, [defense counsel], or he didn't file a lawsuit, you know, and I know, is inappropriate."

After further discussion in which the defendant expressed its reliance upon *Leahy v. Illinois Power Co.* (1981), 103 Ill. App. 3d 487, 431 N.E.2d 390, the trial court reiterated that "[t]he impeachment must be on a material issue before the Court. That is not a material issue before this Court," referring to

"[t]he questions of whether or not [plaintiff] lied in Hopkinsville, Kentucky, and the general questions of his knee, [defense counsel]; I didn't ask these doctors not to link this matter up. The Court didn't participate in the depositions that were taken in this case, and for there to be a linking between the \*\*\* 1983 injury and the 1987 injury there must be either a medical linking or an injury to the same specific area, which we do not have in this case, [defense counsel]."

The trial court advised counsel that "the situation is close to being out of hand, and if the Court has to step in again, then there will be certain incumbent risks taken and the Court will have to deal with that." The trial court stated that it "simply does not believe that an injury to the knee, which was an anterior injury in the first instance, is necessarily related or is even causally related to a posterior injury, as we have here." The court added that "[t]here has been no identity of parts shown or any linking of it made or could be from any doctor. There has been none."

Thereafter, during cross-examination, the following questions were asked and answers given:

"Q. Mr. Wilson, you had testified earlier that your leg now or since this accident of August 31st, '87 sometimes gives out on you or feels like it wants to give out on you?

A. Yes, sir, that's correct.

Q. Did you also have that sensation in September of 1985?

A. No, sir. I have never had a sensation like that.

Q. Did you state in September of 1985 that, and I'm quoting, 'My left leg, if I walked on it very much, it would swell up on me and hurt me real bad. Sometimes it felt like it was wanting to go out on me, give out on me'?

A. No, I don't remember saying that."

Included as part of the record on review is the transcript of trial had on September 17, 1985, in Muhlenberg Circuit Court in Kentucky in the case of Jeff Wilson v. Mark A. Eversole *et al.*, Civil Action No. 84—CI—105. On direct examination therein the plaintiff described the pain in his left leg following the accident of July 22, 1983:

"And my left leg, if I walked on it very much, it would swell up on me and hurt me real bad.

Sometimes it felt like it was wanting to go out on me; give out on me."

The plaintiff testified concerning an arthrogram that had been performed. In response to the following, "Now, there will be testimony in this case that as a result of that Arthrogram, Dr. Wan has recommended surgery on your leg," the plaintiff stated, "Yes; he has." In response to the question, "Okay; do you intend to have that surgery?" the plaintiff answered, "Yes." The plaintiff testified that prior to July 22, 1983, he had been "a backhoe operator, truck driver" and that he had operated his own backhoe and truck, which equipment had been obtained in 1982. Following the accident, he testified, he did not continue to operate the backhoe and truck, but his father did. Thereafter, on direct examination the following questions were asked and the following answers were given:

"Okay. Now, you're a big, strong looking fellow.

Prior to the accident, what kind of activities did you engage in?

I'm talking about other than work?

A. Swimming, horseback riding; used to run up and down the lane a little bit.

Walked a lot. Played a little basketball every now and then. And jumped rope.

Q. Have you been able to do that since this accident?

A. No; I haven't.

Q. What work have you done since the accident?

A. What work have I done?

Q. Uh-huh.

A. Myself, I hadn't done no work, but what the doctor told me to do.

And he told me to try it and see, see if I could do it.

And I got on the backhoe a few times and tried it, but I was hurting so bad I had to get off of it."

He indicated that his father had operated the backhoe after the accident. Asked, "Have you had any work for any pay since the time of your accident on July the 22nd, 1983?" the plaintiff answered, "No; not as I can remember." He stated that he had not looked for any work since that accident

"[b]ecause there ain't nothing I can do. You either got to be a laborer; you got to have a education.

And I ain't got a education to do nothing but, you know, like the backhoe, you know, what I've done all my life.

Besides the railroad, and you know, everything else consist of, you know, I have to bend, stoop, or physical activity."

Asked on cross-examination, "What period are you claiming damages for lost wages as a result of this accident?" the plaintiff responded, "From the period I was injured until today." On further cross-examination he stated that there were only two occasions since July 22, 1983, when he was on the backhoe.

The videotaped deposition of the plaintiff's expert, Dr. McInnis, is not included in the record for review, and the testimony of this witness is not included in the transcript of proceedings. Nor is the transcript of the evidence deposition of Dr. Stanley Collis taken on January 3, 1990, included as part of the record for review.

Included in the record for review is the evidence deposition of Dr. Mark Crawford taken on behalf of the defendant on January 31, 1990. The trial court excluded the deposition from evidence. Dr. Crawford, an orthopedic surgeon, testified that he had first seen the plaintiff on August 22, 1983, in Hopkinsville, Kentucky. At that time he began to treat the plaintiff for a back injury, namely, a lumbar-muscle strain, that occurred in an automobile accident about one month earlier. On March 5, 1984, the witness said, the plaintiff "had a new complaint of pain in the left knee over the front of the knee." The plaintiff "indicated the pain had started since the wreck in which he had injured his back, he said that he had struck his knee against the dash during the accident." On November 12, 1984, the witness said, the plaintiff "came in complaining of pain in the left knee, again the same pain that had been going on since his accident of 1983. At this exam he did have crepitance beneath the knee cap when he moved his [left] knee." Dr. Crawford testified further that

"[t]he pain was primarily over the front of the knee, it would snap and pop occasionally. He was not having any episodes of

giving-way, it was not locking up on him, but it would swell occasionally.

His examination did not show any fluid in the knee. It did show the previously noticed suprapatellar crepitance, he had a full range of motion, his ligaments were normal on exam. We made another [X]-ray of his knee and this did not show any abnormalities.

The particular view of the knee cap that showed the calcification on the [X]-ray that I had made some months previously, we did not repeat that particular view and at that time I told him that I felt even more certain at this point that this was chondromalacia since we were now feeling the suprapatellar crepitance."

The witness stated that "[t]he chondromalacia definitely can cause symptoms as he was describing, pain over the front of the knee, worse with activities involving squatting and going up and down steps." Dr. Crawford described chondromalacia as a condition that does not disappear with time but gradually gets worse with time. He testified that the mainstay of the treatment of chondromalacia of the patella is quadriceps-strengthening exercises which do help in the "overwhelming majority of the cases" but do not relieve the symptoms altogether and "won't make the pain and snapping go away." The witness explored with the plaintiff the performing of an arthroscopy primarily for diagnostic purposes; the plaintiff's reaction was that "[h]e wanted to know what disability rating I would give him concerning the knee and based on the exam and history at that point I told him it would be 5% permanent impairment to the whole person." To make this determination Dr. Crawford had used the "A.M.A. Guidelines." He did not see the plaintiff after December 3, 1984. In response to the question, "Doctor, were you able to form an opinion as a result of your treatment of Mr. Wilson over that period of approximately a year and a half and based upon a reasonable degree of medical certainty as to whether the chondromalacia of the patella might have been or could have been caused by the automobile accident that he reported as having occurred in July of 1983?" Dr. Crawford answered, "Yes, I felt that certainly it was possible that it could be caused by an auto accident striking the knee against the dash. As to whether or not that was the case depends upon the accuracy of history." Asked, "There was no other history of any trauma that was given to you at least by Mr. Wilson during your treatment of him?" the witness answered, "No, sir, he specifically related to the automobile accident."

On cross-examination, when asked whether he had compared the left knee with the right knee for crepitance, the witness responded in part:

> "[S]ince [chondromalacia] is so ubiquitous and so common and often is present without causing symptoms until some point and time I would typically go ahead and feel the opposite knee to feel if there is any crepitance there and then that will, if there is a lot of it that usually answers the question as to whether it was a preexisting condition or not.
>
> If the uninjured knee is crackling and crunching too then you can bet it was there before the opposite knee was injured, but I didn't state in these records that I did it and so I cannot say that I did perform that exam. I would just say that most likely knowing the way that I do exams, that most likely I did and most likely I did not feel any crepitance."

Dr. Crawford testified that his "records specifically reflect that I did not feel that he had any ligamentous laxity." He did not feel, he said, that the plaintiff had "any excess ligamentous laxicty [sic] or any evidence of a torn ligament." Asked whether his treatment of the plaintiff had been "directed more towards the concern with the back or with the knee," Dr. Crawford stated, "It was primarily the back."

The defendant contends that the trial court's ruling effectively prevented it from impeaching the plaintiff with respect to a major issue in the case and was, therefore, erroneous. The defendant contends further that, quite apart from the matter of impeachment, the plaintiff's prior condition of ill-being and, in particular, his earlier claim of permanent injury to the left knee as a result of the injury in 1983 were relevant to the question of causation and to the plaintiff's claim of permanent disability from the present injury. The defendant asserts that the "[p]laintiff's successful attempt to conceal the extent of the knee injury that he had suffered in 1983 deprived defendant of its right to present its defense on the question of damages," arguing that the law does not require a precise, exact identity of body parts, tissues, and organs before it will allow evidence of a prior injury to the same part of the body.

■ The rule in Illinois is clearly to the effect that, in a cause of action for personal injury, evidence as to prior similar injuries is admissible as being probative on the issue of the amount of damages and extent of injuries. (*Khatib v. McDonald* (1980), 87 Ill. App. 3d 1087, 410 N.E.2d 266.) Generally, a plaintiff may be cross-examined as to his previous physical condition or injuries when they are of a nature similar to those involved in the immediate litigation. (*Leahy v.*

*Illinois Power Co.* (1981), 103 Ill. App. 3d 487, 431 N.E.2d 390.) Such examination is proper to show that the plaintiff's present physical condition is not the result of the occurrence for which the immediate suit was brought but was caused, in whole or in part, by an earlier injury or preexisting condition. (*Saputo v. Fatla* (1975), 25 Ill. App. 3d 775, 324 N.E.2d 34.) Such cross-examination is proper to show causation or to lay the foundation for impeachment, and, inasmuch as the fact of such prior injuries is both material and probative, it follows that impeachment thereon is proper as well. (*Leahy v. Illinois Power Co.* (1981), 103 Ill. App. 3d 487, 431 N.E.2d 390.) In order for a prior statement to be sufficiently inconsistent to be used for impeachment purposes, it must contravene the witness' direct testimony on a material matter. (*Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 515 N.E.2d 146.) Where a defendant claims he did not cause the plaintiff's injury, evidence of another cause may arise in impeachment. (*Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 515 N.E.2d 146.) However, before impeachment with the collateral event is considered relevant the defendant must establish a connection between the prior incident and the injury at issue. (*Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 515 N.E.2d 146.) Such a connection is established when the defendant can prove that the prior incident actually occurred and when the plaintiff's previous condition or injury is of a nature similar to that at issue. (*Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 515 N.E.2d 146.) Once a connection is shown, the fact of the prior injury is material and probative, and impeachment thereon is proper. *Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 515 N.E.2d 146.

In the recent case of *O'Brien v. Thomas Steel Corp.* (1989), 181 Ill. App. 3d 901, 538 N.E.2d 1162, the trial court excluded testimony concerning the plaintiff's prior back injury. The plaintiff in *O'Brien* admitted having suffered a prior back injury in 1978, seven years before the back injury in question in *O'Brien*. However, the parties disagreed as to the severity of the plaintiff's prior injury. In ruling that the failure of the trial court to allow the defendant to introduce evidence of the plaintiff's prior back injury was sufficient grounds to order a new trial, the *O'Brien* court observed:

> "Evidence of a prior injury is admissible where the injury involves the same area of the body. (*Palsir v. McCorkle* (1966), 70 Ill. App. 2d 425, 216 N.E.2d 682; *Elberts v. Nussbaum Trucking, Inc.* (1981), 97 Ill. App. 3d 381, 422 N.E.2d 1040.) The *Palsir* and *Elberts* decisions do not require that a causal connection between injuries be established in order for evidence of the prior injury to be admitted. In addition, *Vandermyde v.*

*Chicago Transit Authority* (1979), 73 Ill. App. 3d 984, 392 N.E.2d 48, stands for the proposition that no medical evidence of any kind is needed to introduce the existence of a prior injury where the prior and current injuries are in the same area of the body. The *Vandermyde* case [which involved injury to the plaintiff's back] has been followed by *Falkenthal v. Public Building Comm'n* (1982), 111 Ill. App. 3d 703, 444 N.E.2d 498, which involved an injury to the plaintiff's head. In *Falkenthal,* plaintiff's expert testified that a blow had caused a condition of narcolepsy in the plaintiff. The defendant's expert testified that narcolepsy could not have been caused by a trauma to the head. Defendant was allowed to introduce evidence of two prior accidents that had also caused injuries to her head. There was no testimony from any expert that the two prior injuries caused plaintiff's narcolepsy. The court found that the two prior injuries were admissible because they were to the same area of the body. *Falkenthal v. Public Building Comm'n* (1982), 111 Ill. App. 3d 703, 444 N.E.2d 498.

In this case the defendant states that Dr. Greenwald, the plaintiff's treating doctor in 1978, will testify that he diagnosed plaintiff's 1978 injury as L-5 disc syndrome, supported by a myelogram taken on January 25, 1979. The plaintiff's present injury was diagnosed as a herniation of two spinal discs, one at L-4 back level, and the other at L-5. Certainly the two injuries are located in a similar area of the plaintiff's body. Consequently, the injuries fall within the guidelines set forth in *Palsir* and *Elberts* and do not require the defendant to establish a causal connection between the plaintiff's present injury and the 1978 injury." *O'Brien,* 181 Ill. App. 3d at 904, 538 N.E.2d at 1163-64.

In the still more recent case of *Elliott v. Koch* (1990), 200 Ill. App. 3d 1, 558 N.E.2d 493, after a review of the relevant case law, the court expressly concluded that *O'Brien* provides the rule on the issue of whether a connection must be established between a plaintiff's prior and present injuries in order for evidence of a prior injury to be admissible. Noting that some courts have held that evidence of a prior injury is admissible if a causal relationship between the injuries is shown or when the injury involves the same area of the body, the court in *Elliott* pointed out that this rule is based on the maxim that evidence which is relevant to an issue in controversy is admissible and that, in a personal injury action, such evidence is relevant to two ultimate issues in the action, namely, whether the defendant's negligence

was the proximate cause of plaintiff's injury and the extent of plaintiff's damages. The court noted as well that a causal connection between prior and present injuries is required only where the injuries do not involve the same area of the body. In *Elliott* the plaintiff argued that he was prejudiced by the introduction of evidence of his prior back injuries because defendants failed to connect these injuries to his present one. In his reply brief plaintiff argued that there was no evidence showing the prior injuries, which were diagnosed as back strain, involved injuries to a disc, his present injury; plaintiff took the position that there is a substantial difference between the back strain and herniated disc and, therefore, the prior injuries do not involve the same part of the body. The court stated that "[p]laintiff's prior injuries involve the same area of his body: the lower back" (*Elliott*, 200 Ill. App. 3d at 14, 558 N.E.2d at 503) and in *dicta* pronounced plaintiff's argument to the effect that the prior injuries to the low back and the herniation of the disc in the lumbosacral area of the back were not to the same area of the body "wholly unsupportable" (200 Ill. App. 3d at 14, 558 N.E.2d at 503). Because the argument was raised for the first time in the plaintiff's reply brief, the court would not consider it. In conclusion, the court in *Elliott* stated that the injuries involved the same area of the body and, thus, that evidence of the plaintiff's prior injuries was admissible without any independent showing of causal connection.

■ In the instant case, the anatomical precision urged by the plaintiff and adopted by the trial court was inappropriately narrow for purposes of determining relevance with respect to the elements of causation and damages, particularly in light of the plaintiff's testimony concerning pain and disability. We hold that the injury to the plaintiff's left knee sustained in July of 1983 and the injury to his left knee sustained in August of 1987 involve the same area of the body. Thus, evidence of plaintiff's prior injury was admissible without any independent showing of causal connection. The plaintiff's physical condition as he described it in his earlier testimony concerning the prior injury is indisputably similar to his physical condition as he described it at trial concerning his present injury. The prior injury was a proper subject for consideration by the jury in its deliberations. We must disagree with the plaintiff's statement in his brief that

"[c]ontrary to the accusation [contained in the defendant's brief], the trial court did NOT limit inquiry into plaintiff's prior knee injury. The record is replete with plaintiff's ADMITTING to defense counsel that, indeed, he had sustained a knee injury on July 22, 1983, as a passenger in his cousin's vehicle in Ken-

tucky, and sought repeated medical treatment for that injury
*** "

The record reveals that, particularly in the absence of the defendant's opportunity to complete impeachment, the plaintiff was able, in his testimony before the jury, to minimize and even to distort the consequences of the prior injury to his knee as compared with previous statements he had made describing them. Nor was the defendant allowed to introduce testimony by Dr. Crawford concerning the prior injury that might have served to contradict the plaintiff's testimony in this regard. The defendant's case was unduly prejudiced by the trial court's improper restriction of defendant's inquiry into the history of the condition of the plaintiff's left knee. Therefore, the judgment of the trial court is reversed, and the cause is remanded for a new trial.

In view of our determination with respect to the admissibility of evidence of the plaintiff's prior injury, we need not consider the other issues presented by defendant for our review. Nor do we make any determination concerning a subissue of the first issue defendant raises, concerning the admissibility, as an exception to the hearsay rule or as an admission by adoption, of the testimony of Dr. Wan taken by evidence deposition on behalf of the plaintiff on September 5, 1985, and admitted into evidence during the trial conducted later that month.

Reversed and remanded.

HOWERTON, J., concurs.

PRESIDING JUSTICE GOLDENHERSH, dissenting:
I respectfully dissent.

In my judgment there was no improper limitation by the trial court upon defendant's ability to cross-examine plaintiff, Jeffrey K. Wilson, on his alleged prior injury and resultant lawsuit. The trial court consistently held to the position that the front of the knee was not the same place as the back of the knee and therefore defendant would have to establish some form of connection above and beyond both injuries being to the knee. I believe that the existent authority in this State shows the trial judge to be correct. In *Marut v. Costello* (1966), 34 Ill. 2d 125, 214 N.E.2d 768, affirming *Marut v. Costello* (1964), 53 Ill. App. 2d 340, 202 N.E.2d 853, the supreme court and the First District Appellate Court both held that allowing cross-examination was reversible error in a situation where the prior injury occurred to the upper back and resulted in operations upon the cervical

spine and the subject injury of the instant suit was one involving operations on the lower back or lumbar area. *Marut* is "on all fours" with the instant case in which the trial judge appropriately continued to stress the difference between the anterior of a knee and the posterior of a knee and demanded some connection before allowing cross-examination.

The authorities cited by the majority are not so nearly in point as *Marut* and do not resolve the problems of either a lack of connection between the two injuries or a lack of injury to the same area. In *Leahy v. Illinois Power Co.* (1981), 103 Ill. App. 3d 487, 431 N.E.2d 390, the plaintiff disputed the reference to the prior lawsuit rather than the question of prior injury to the same area of the plaintiff's back. In *Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 515 N.E.2d 146, the court stated that the defendant must establish some connection between the prior incident and the instant injury, basically that the prior incident occurred and that the previous injury was of a similar nature to the one at issue. In *Chavez*, as in *Leahy*, the injury seemed to be a general back injury or a general lower back injury, and the main conflict between the parties was on attribution of injury to the first or second incident rather than the location of the injury. In *Saputo v. Fatla* (1975), 25 Ill. App. 3d 775, 324 N.E.2d 34, the prior and instant injuries involved the lower back. The injury in *Elberts v. Nussbaum Trucking, Inc.* (1981), 97 Ill. App. 3d 381, 422 N.E.2d 1040, was admitted by plaintiff's counsel in argument before the trial court to be in the same area of the back as the injury on trial. The case of *Palsir v. McCorkle* (1966), 70 Ill. App. 2d 425, 216 N.E.2d 682, involved prior problems and a present injury dealing with the plaintiff's right side, the prior injury involving the plaintiff's right flank, groin and his knees, and in the suit on trial involved the entire right side. In the case of *O'Brien v. Thomas Steel Corp.* (1989), 181 Ill. App. 3d 901, 538 N.E.2d 1162, relied upon by the majority, the prior and instant injuries both involved the L-5 spinal disk.

In this case, the trial court properly observed that the claimed prior injury was to a different part of the body than the instant case and properly required connection between the two before allowing any cross-examination despite repeated attempts and requests to allow that cross-examination without the requisite connection. A review of the authorities cited by the majority shows that the trial court was correctly following case authority on this point. I therefore respectfully dissent from the majority's opinion.