GENETTA PAYNE, Plaintiff-Appellant, v. EVERETT NICHOLAS, Defendant-Appellee.

First District (2nd Division)   No. 86—2119

Opinion filed May 19, 1987.

Joseph Michael O'Callaghan, of Chicago, for appellant.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T. Ferrini, Fredric J. Grossman, Tyler Jay Lory, Lisa Marco Kouba, and Helen M. Ryan, of counsel), for appellee.

JUSTICE STAMOS delivered the opinion of the court:

Plaintiff brought this medical malpractice action seeking damages from defendant. The jury returned a verdict for defendant. Plaintiff appeals and contends that numerous errors were committed by the trial court.

Plaintiff, Genetta Payne, is a 31-year-old unmarried computer terminal operator. Plaintiff testified that in 1978 she had a cyst removed from her chest; such surgery left a transverse or vertical scar in the center of her chest approximately one-half inch long. The scar caused an intermittent throbbing and itching sensation. In October 1979, when she was hospitalized for an unrelated condition, her attending physician discovered a lump on her breast and referred her to defendant, a general surgeon. As defendant examined plaintiff, he noted the scar from the cyst removal and told plaintiff the scar did not look good but "could be made to look better." Defendant told plaintiff nothing else about the scar and did not inform her that there was a risk the scar would look worse.

Defendant performed surgery on plaintiff's scar the following day. He visited plaintiff on each of the three days thereafter. Defendant did not remove plaintiff's bandage and did not tell plaintiff to seek radiation treatments. Plaintiff was instructed to make a follow-up appointment with defendant one month later. Approximately two weeks after surgery, plaintiff's attending physician, Dr. Burachynskyj, removed the sutures from plaintiff's surgical wound. At plaintiff's follow-up appointment with defendant in November, defendant examined plaintiff's scar and asked her if she had taken radiation treatments at the hospital following surgery. Defendant told plaintiff that such treatment should have been sought immediately after surgery. Defendant then injected cortisone directly into the scar to flatten it. Plaintiff stated that the scar was now open, raised and very long.

The cortisone injection was very painful. The pain was similar to that plaintiff experienced during surgery when plaintiff could feel the pulling and cutting of the surgical procedures as well as a burning sensation. This pain lasted approximately six months.

Plaintiff returned to defendant two weeks later. Again she was given an injection of cortisone into the scar. Plaintiff did not keep her next appointment with defendant because the injections were too painful.

Plaintiff exhibited her new scar to the jury. She testified that the scar is now approximately three inches in length and is painful when she bathes the area or bumps it. In addition, plaintiff stated that she feels ashamed when she is around women and men. Plaintiff stated

that this scar prevents her from wearing swimsuits and lower-cut blouses.

On cross-examination, plaintiff testified that defendant never told her there was a possibility that the scar would grow back. Plaintiff maintained that defendant initiated the comments on plaintiff's scar when he first examined her. Plaintiff admitted that her new scar does not physically prevent her from carrying on with her work.

Defendant, a board-certified general surgeon, testified that he first saw plaintiff on October 4, 1979, at the request of her attending physician. Defendant noted in a report to Dr. Burachynskyj that plaintiff had a keloid scar which she stated was painful and requested excision. Defendant's report stated that no assurances were given as to the end result of surgery. Defendant further recommended in his report that superficial X-ray treatment was to follow. Defendant did not show this report to plaintiff although he maintained that he told her he was ordering such treatment. Defendant noted in his preoperative report that plaintiff's scar was approximately one-half inch in length prior to surgery. During surgery, defendant removed the tissue surrounding the scar approximately 1 to 1½ inches in length. Defendant initially denied telling plaintiff that he would try to improve the scar, but was then presented with a transcript of his deposition in which defendant admitted that he had so told plaintiff.

Defendant did not seek a consultation with a plastic surgeon but performed surgery the following day. Plaintiff signed a surgery consent form which contained the provision that no assurances had been given as to the result. Defendant prescribed a painkiller after the surgery, but did not write any other orders with regard to plaintiff's treatment, and specifically did not write an order for X-ray treatment. Defendant admitted that the hospital in which plaintiff was staying did not have the equipment with which to provide this type of superficial skin dose radiation. Defendant did not suggest to plaintiff's attending physician that such radiation be used and made no arrangements for plaintiff to be treated at another facility. Defendant admitted that he did not give plaintiff a prescription for this treatment and that, without such prescription, no X-ray laboratory would have proceeded with this treatment.

Defendant did not examine plaintiff's wound on his three visits following her surgery. Defendant then left town for approximately two weeks, leaving instructions with his nurse to remove plaintiff's sutures. Defendant made no arrangements for plaintiff to see a plastic surgeon or to have her scar injected with steroids during his absence. In closing plaintiff's surgical wound, defendant stated he did

not intend to evert the wound with an inner layer of sutures, causing it to turn outward from its normal plane, but only intended to approximate the wound edges.

Dr. T. Shelly Ashbell, plaintiff's expert witness, a board-certified plastic surgeon and chairman of the division of reconstructive surgery of the Chicago Medical School, testified that plastic surgery is a specialty within the field of general surgery, requiring additional training. Dr. Ashbell stated that scar revision is a procedure that should only be done by a plastic surgeon because only plastic surgeons have been trained in the techniques of such surgery. Dr. Ashbell explained that a keloid scar is a scar that continues to grow beyond the edge of a wound, while a hypertrophic scar is a scar which has become thick, hard and wide but remains within the bounds of the wound. Dr. Ashbell testified that he had performed thousands of scar revisions.

Dr. Ashbell examined plaintiff and the operative and pathology reports of plaintiff's surgery as well as defendant's deposition testimony. Dr. Ashbell opined that defendant deviated from the acceptable standard of care in his treatment of plaintiff. Dr. Ashbell stated that plaintiff should have been referred to a plastic surgeon because defendant was unqualified to perform such surgery. Moreover, it was error for defendant to change the direction of plaintiff's scar from transverse to vertical as scars that lay transversely are under minimal tension and heal much better. Dr. Ashbell explained that eversion, or the raising of the edges of skin, is necessary to insure the proper tension to produce a thin, fine scar, particularly in the presternal area. Based on defendant's deposition, in which he stated that he did not evert the skin, Dr. Ashbell opined that defendant deviated from the requisite standard of care.

Dr. Ashbell also stated that defendant deviated from this standard in failing to prescribe radiation therapy. Such therapy would have minimized the tendency for recurrence of the excised scar. Defendant's responsibility as surgeon was to see that such treatment was carried out within three days after surgery. Defendant should also have examined the surgical wound within two to five days following the surgery. Steroids or cortisone injections are less effective than X-ray therapy in minimizing scar tissue, Dr. Ashbell opined. However, if used, such therapy should begin immediately.

On cross-examination, Dr. Ashbell admitted that all he knew about defendant's background, i.e., that defendant was a general surgeon with no plastic surgery training, was what he had been told by plaintiff's attorney. Dr. Ashbell conceded that if he learned that defendant had a significant amount of plastic surgery training, he would change

his opinion of defendant's decision to perform the instant surgery. He also admitted that he never saw plaintiff's original scar and assumed it was horizontal and not vertical because he had been told such by plaintiff's counsel. Dr. Ashbell also admitted that when a scar revision is performed, the incision must be longer than the original scar. Dr. Ashbell further admitted that keloids located in the sternal area have a high rate of recurrence despite the best of surgical care.

Defendant was recalled as a witness in his own case. He testified that following his graduation from medical school, he completed two surgical externships. During the latter six-month externship, defendant worked with three plastic surgeons in burn treatment, wherein he assisted these surgeons in the removal of keloid scarring. Defendant next served on the residency staff of Cook County hospital for three years where he performed excisions of keloid scarring to relieve a patient's disability. Defendant also entered the military as a physician and was assigned to work as a surgeon in a plastic surgery center. Upon his return, defendant received his board certification in general surgery.

Defendant testified that he examined plaintiff at the request of her attending physician after she was admitted to the hospital on October 4, 1979. Defendant was asked to conduct a breast examination. During his conversation with defendant, plaintiff directed his attention to a keloid scar in the mid-sternal area of her chest, told defendant it was painful and asked him to remove it. Defendant agreed to perform the surgery, but made no assurances to plaintiff as to the end result, as keloid scars recur occasionally or extend laterally in both directions from the original scar site.

During plaintiff's surgery, defendant made an elliptical incision extending beyond, but near, the lesion. Defendant chose to make a vertical incision to prevent such incision from extending into breast tissue and becoming troublesome to plaintiff in the future. Defendant then undermined the tissues, i.e., separated each layer, to allow them to be brought together more readily. Defendant thereafter sutured the deeper layer of tissue with individual stitches, knotting each stitch separately. The upper layer of skin was brought together with a running stitch under the surface of the skin. Steristrips were also used to reduce tension on the wound.

Defendant visited plaintiff for three days following surgery, then left on a 10-day vacation. Defendant assumed that Dr. Burachynskyj would send plaintiff to an X-ray facility of his choice after her discharge, preferably within 7 to 10 days following surgery. When defendant met with plaintiff again, approximately one month fol-

lowing her surgery, he noted the formation of keloid in the vertical incision and learned that X-ray treatment had not been carried out. Defendant injected hydrocortisone under the lesion. A second injection was given and plaintiff was advised that additional injections might be necessary. Plaintiff, however, never returned.

Dr. Gerald Menaker, a board-certified surgeon and defendant's expert witness, testified that he had assisted in the excision of keloid scars during his residency program. Dr. Menaker examined the transcript of defendant's deposition testimony and opined that defendant had not deviated from the requisite standard of care. He stated that the incision made by defendant was not too large but rather was adequate to excise the entire scar specimen. Normal skin above and below the keloid must be taken out to approximately the edges and to prevent extra skin from accumulating around the wound.

Dr. David Fisher, a board-certified plastic surgeon, testified at trial. Plaintiff previously had objected to the addition of Dr. Fisher as an expert two weeks prior to the close of discovery, claiming Fisher had not been timely disclosed. Defendant's intention to call Fisher was disclosed eight days after plaintiff produced Dr. Ashbell, her expert, for his deposition. Plaintiff moved to bar Fisher's testimony at trial, but the trial court denied plaintiff's motion.

Dr. Fisher testified at trial that after examining defendant's hospital records and deposition testimony, he opined that defendant's treatment had not deviated from the applicable standard of care. Defendant's plan of procedure in excising the keloid and following with X-ray therapy was an accepted plan. As one of the theories of keloid recurrence is tension, defendant's use of interrupted stitches was appropriate. Defendant's apparent use of eversion also created a support level of subcutaneous tissue. Defendant's use of a running stitch to close the outer skin was also appropriate as the removal of such sutures later minimally disturbed the wound. Dr. Fisher noted that keloids recur in 60% of all patients with dark skin, such as plaintiff, and usually require several revisions.

Dr. Burachynskyj testified during rebuttal that he referred plaintiff to defendant for a breast examination alone. Defendant excised the scar on plaintiff's chest, but never told Dr. Burachynskyj to order follow-up X-ray treatments or complained that Dr. Burachynskyj had so failed to order such treatments.

During closing argument, defendant's counsel made the following remarks:

> "I also want you to consider weighing those kinds of feelings between the kinds of feelings Dr. Nicholas may be having. He's

been going through this since 1981. The man believes he did what he should have done. He's supported by experts who say he did what he should have done. Consider that, ladies and gentlemen. If you must award damages consider that."

Plaintiff's counsel objected to this statement and asked the court to strike such statement, but the court declined to do so. Thereafter, defense counsel also stated as follows:

"Do you remember during jury selection I asked you the question: Did you believe that doctors would intentionally hurt a patient? Ladies and gentlemen, for you to accept the story that plaintiff suggests to you, you would have to believe that this man intentionally wanted to hurt that woman."

Plaintiff's counsel also objected to this argument, but the objection was overruled.

At the instructions conference, plaintiff tendered several instructions to the court regarding the issue of negligence, including the definition of proximate cause. The proximate cause instruction tendered by plaintiff, Illinois Pattern Jury Instructions, Civil, No. 15.01 (2d ed. 1971) (hereinafter IPI Civil 2d), provided:

"When I use the expression 'proximate cause', I mean a cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury."

Such instruction was proferred to the jury. In addition to the foregoing, the court gave the following two special interrogatories. The first interrogatory provided:

"Was the Defendant, Everett Nicholas, M.D., negligent in his care and treatment of the plaintiff, Genetta Payne?"

The court submitted the interrogatory over objection by plaintiff that the question requested the jury to render a decision on a question of law. The second special interrogatory, dealing with a finding of probable cause, provided:

"If you have determined that the defendant, Everett Nicholas, M.D., was negligent in his care and treatment of the plaintiff, Genetta Payne, was this negligence the proximate cause of her injuries which she is complaining of?"

Plaintiff's counsel objected that such interrogatory was not supported by the evidence.

The jury thereafter retired and returned a general verdict in favor of defendant. Consistent with the verdict, the jury's answers to

the special interrogatories established that although defendant was found to be negligent, such negligence was not the probable cause of plaintiff's injury. Plaintiff thereafter filed this appeal, seeking entry of judgment in her favor on the liability issue and a new trial on the issue of damages.

Plaintiff's first contention on appeal is that the trial court permitted the jury to be misinstructed and misinterrogated on the issue of proximate cause. Specifically, plaintiff maintains that the trial court erred in tendering special interrogatory number 2 and IPI Civil 2d No. 12.04 to the jury which stated that defendant's negligence must be the proximate cause of plaintiff's injuries. Plaintiff asserts that she was required to prove the defendant's conduct was a proximate cause of her injuries, rather than that defendant's conduct was the proximate cause of her injuries.

■■ ■ It is settled that special interrogatories must be tendered, objected to, ruled upon and submitted to the jury in the same manner as are instructions and thus specific objections to special interrogatories must be made at the instructions conference. (87 Ill. 2d R. 239(b); *Falkenthal v. Public Building Com.* (1982), 111 Ill. App. 3d 703, 444 N.E.2d 498; *Gasbarra v. St. James Hospital* (1979), 85 Ill. App. 3d 32, 406 N.E.2d 544.) Here, at the instructions conference, plaintiff objected to special interrogatory number 2 solely on the ground that it was not supported by the evidence. Only now on appeal does plaintiff contend that the interrogatory was improper because it was misleading to the jury and changed the nature of her case regarding proximate cause. Because none of such contentions now raised by plaintiff regarding the special interrogatory were raised by her at the instructions conference, she has waived them. *Falkenthal v. Public Building Com.* (1982), 111 Ill. App. 3d 703, 444 N.E.2d 498; *Migliore v. County of Winnebago* (1974), 24 Ill. App. 3d 799, 321 N.E.2d 476.

■ Plaintiff's objection to the language of IPI Civil 2d No. 12.04, also tendered to the jury, is similarly waived. Such instruction provided as follows:

> "More than one person may be to blame for causing an injury. If you decide that the defendant was negligent and that his negligence was the proximate cause of the injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.
>
> However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant."

At the instructions conference, plaintiff's counsel objected only to

the addition of the second paragraph in the instruction and maintained that the second paragraph would be unnecessary whether the jury found defendant guilty or not guilty. Counsel did not object to any alleged improper language in the instruction as plaintiff does now on appeal. Accordingly, plaintiff has also waived this argument regarding admission of the instruction as error.

■ Plaintiff's second contention on appeal is that the trial court erred in granting defendant's motion to dismiss plaintiff's breach of warranty action. Plaintiff filed a second amended complaint at the close of her case which purported to add a cause of action for breach of warranty, but the trial court subsequently dismissed the breach of warranty count for failing to allege both a specific warranty and separate consideration. The court further noted that even if it would deny defendant's motion to dismiss the count, it would grant defendant a directed verdict on the count because plaintiff had no proof to establish such breach of warranty claim.

In Illinois, courts will consider enforceable a warranty by a physician, to cure a patient, if plaintiff alleges and proves that the physician made such warranty, that plaintiff relied on this warranty and that there was separate consideration for the warranty. (*Gault v. Sideman* (1963), 42 Ill. App. 2d 96, 191 N.E.2d 436; *Carroll v. Grabavoy* (1979), 77 Ill. App. 3d 895, 396 N.E.2d 836.) In *Gault v. Sideman*, where defendant's physicians recommended surgery to correct a ruptured intervertebral disk and such surgery resulted in paralysis of the plaintiff's left leg, the appellate court held that the plaintiff's pleadings did not properly set forth a cause of action. The court noted that it was unable to find any Illinois cause which held a physician liable for an agreement that an operation would cure an existing condition.

In *Rogala v. Silva* (1973), 16 Ill. App. 63, 305 N.E.2d 571, where plaintiff underwent a sterilization operation and thereafter became pregnant and gave birth to a sixth child, the appellate court held that a contract of a physician to effect a particular cure must be proved by clear and convincing evidence and supported by separate consideration. The court rejected plaintiff's claim of a breach of an express warranty after it found that the foregoing elements, particularly the existence of an express warranty, had not been established. Lastly, in *Carroll v. Grabavoy*, plaintiff testified that defendant specifically promised to provide defendant with dentures which would be attractive and fit well and would be pleasing to her, but claimed that such dentures were too large and caused her much pain. Plaintiff's cause of action for breach of both express and implied warranties were struck down by the appellate court, which found that the elements of

a breach of warranty action were not established by the facts of that case.

■■ Here, there is no clear evidence that a warranty was ever made to plaintiff. Plaintiff testified that she desired the scar to be removed not only to improve its appearance but because it caused discomfort. Plaintiff stated that defendant told her the scar could "be made to look better." Such statement was at most an opinion as to the probable outcome of the surgery rather than a guarantee of a specific result. (*Rogala v. Silva* (1973), 16 Ill. App. 3d 63, 305 N.E.2d 571.) Defendant testified that he expressly told plaintiff that he could not assure her of the end result. While plaintiff denies that defendant made this statement, such remark was written on plaintiff's hospital chart. In addition, plaintiff signed the surgical consent form in which it was expressly stated that no guarantee or assurance was given to plaintiff by anyone as to the end results that might be obtained. Plaintiff made no attempt at trial to claim that she was unaware of this provision.

Plaintiff relies on the case of *Cirafici v. Goffen* (1980), 85 Ill. App. 3d 1102, 407 N.E.2d 633, as in support of her contention that a warranty may be recognized in some circumstances involving elective and noncompulsory treatments. However, we find that *Cirafici* is clearly distinguishable from the instant case. There the defendant dentist told plaintiff that she would be able to "eat with her dentures, corn on the cob and other foods for which natural teeth are particularly suitable." While in *Cirafici* a specific promise was made to plaintiff that a determinate result would be reached, here defendant only told plaintiff that he would "try to make the scar look better."

In light of the foregoing, we find that the trial court did not err in dismissing plaintiff's breach of warranty claim.

■■ Plaintiff's third contention on appeal is that defendant's counsel at closing argument asked the jury to consider defendant's feelings when deliberating upon the verdict. We note that there was no objection to the foregoing argument at the time it was made. Accordingly, plaintiff has waived objection to counsel's argument on appeal. Plaintiff also objects to defense counsel's comment in closing argument which inferred that defendant would have had to intend to harm plaintiff to be liable for such. Plaintiff argues that this portion of the argument inferred that plaintiff had the burden to establish that defendant intended to harm plaintiff.

The issue raised by plaintiff is whether these comments of defense counsel were so prejudicial as to deprive plaintiff of a fair trial. (*Nunley v. Mares* (1983), 114 Ill. App. 3d 779, 449 N.E.2d 864.) Substantial

latitude is given counsel in their closing arguments to the jury. *Patur v. Aetna Life & Casualty* (1980), 90 Ill. App. 3d 464, 413 N.E.2d 65.

■ Defense counsel's comment was perhaps inappropriate in light of the fact that there was no evidence that defendant ever intended harm to come to plaintiff, nor likely to any of his patients. However, we do not find that defense counsel's remarks were so prejudicial to plaintiff as to require a new trial. The jury was properly instructed regarding the law in this matter, including plaintiff's burden of proof. Accordingly, we find no merit to plaintiff's contentions that the challenged remarks, separately or cumulatively, prejudiced plaintiff's right to a fair trial.

■ Plaintiff's fourth contention is that the trial court erred in permitting defendant to testify regarding his surgical privileges. Defendant related these privileges were those designated by a surgical control committee which allowed a subject to perform procedures that the committee believed he was in fact trained and had sufficient experience to perform. He also related that he had been granted full surgical privileges at every hospital in which he ever worked.

It is noted initially that while plaintiff apparently objected on the grounds that the admissibility of such testimony might cause the jury to obtain the impression that defendant was within the standard of care in performing plaintiff's surgery, the jury returned a finding that defendant had in some manner been negligent. Thus, such testimony clearly did not prejudice the jury as to plaintiff's case and does not constitute reversible error for this reason.

■ Plaintiff's contentions that such information regarding defendant's surgical privileges should not have been admitted because she would not have been permitted to discover this information is without merit. The medical studies act (Ill. Rev. Stat., 1983 Supp., ch. 110, par. 8—2101) provides:

> "All information *** used in the course of internal quality control *** shall be privileged, strictly confidential and shall be used only for medical research, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges ***."

As the Illinois Supreme Court recently found in *Richter v. Diamond* (1985), 108 Ill. 2d 265, 483 N.E.2d 1256, interrogatories concerning the nature and extent of a physician's staff privileges, including the nature and extent of restrictions imposed by the hospital, seek information which is not protected by the medical studies act. Rather, such statute only protects and prevents disclosure of the peer-review process and of certain information regarding the internal hospital pro-

ceedings and methods of information gathering leading to the ultimate decision rendered by the hospital.

Accordingly, plaintiff here could have sought information regarding the fact of whether defendant had or had not been granted surgical privileges at a chosen hospital, and if so granted, what restrictions were imposed. Thus, we find that the trial court did not err in permitting defendant to testify as to his status with respect to surgical privileges.

■■■ Plaintiff's final contention on appeal is that the trial court erred in permitting defendant to add an additional expert witness, Dr. Fisher, at the commencement of trial. As plaintiff correctly states, Supreme Court Rule 220 (103 Ill. 2d R. 220) provides that the identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party either within 90 days after the substance of the expert's testimony first becomes known to that party or his counsel. Or, if the substance of the expert's opinion is then known, the expert's identity must be disclosed at the first pretrial conference in the case, whichever is later.

Here, defendant disclosed Dr. Fisher as an expert witness on May 9, 1984, eight days after defendant deposed plaintiff's expert, Dr. Ashbell. At the time of the disclosure, two weeks remained before discovery was closed and the case first appeared on the trial call. Defendant thereafter offered to produce Dr. Fisher to allow plaintiff to depose him. Dr. Fisher's identity was also disclosed to plaintiff's counsel at a pretrial conference. The foregoing facts were sworn to by defendant's counsel in an affidavit which appears in the record. Plaintiff refused to depose Dr. Fisher and stated at the hearing on her post-trial motion that she did so because Dr. Fisher had not been timely disclosed and because "it was not our obligation to do anything about it." While the instant case was continued on the trial call for more than one year, plaintiff refused to depose Dr. Fisher and instead, on July 9, 1985, moved to bar his testimony. The trial court denied this motion and gave plaintiff leave to depose Dr. Fisher prior to trial, which plaintiff failed to pursue.

We find that the trial court's decision to allow defendant's expert, Dr. Fisher, to testify was not error.

In light of the foregoing, we affirm the judgment of the circuit court.

Affirmed.

HARTMAN and BILANDIC, JJ., concur.