Fourth Division

July 30, 1998

No. 1-97-3233

CHICAGO TRUST COMPANY, as guardian of  )  APPEAL FROM THE

the Estate of DONALD MACON, a disabled  )  CIRCUIT COURT OF

person,  )  COOK COUNTY.

  )

Plaintiff-Appellee,  )

  )

v.  )

  )

COOK COUNTY HOSPITAL, a municipal  )

corporation; COUNTY OF COOK, a  )

municipal corporation and body political; )

BOARD OF COMMISSIONERS OF COOK COUNTY, a  )  

municipal corporation; PURITAN-  )

BENNETT CORPORATION, a foreign  )

corporation; and HUDSON RESPIRATORY  )

CARE, INC., a foreign corporation,  )

  )

Defendants,  )

  )

and the OFFICE OF THE STATE'S ATTORNEY  )

OF COOK COUNTY,  )  HONORABLE

  )  LYNN M. EGAN,

Contemnor-Appellant.  )  JUDGE PRESIDING.

JUSTICE WOLFSON delivered the opinion of the court:

In this case we review Cook County Hospital's claims that certain of its documents are confidential and that the trial court should not have ordered the Hospital to produce them during discovery in a civil case.  

Cook County Hospital (the Hospital) appeals the trial court's July 25, 1997, order.  The court found the Hospital in contempt for refusing to produce certain documents requested in discovery by Chicago Trust Company, guardian of the estate of Donald Macon.  The Hospital contends the Medical Studies Act protects against disclosure of all of these documents, and that the attorney-client privilege prevents disclosure of two of them.  We agree with the trial court that all the documents should be produced.

FACTS

Donald Macon (Macon) was admitted to Cook County Hospital (the Hospital) on August 16, 1995, and placed on a ventilator.  Two days later, Macon accidentally became disconnected from the ventilator.  Deprived of oxygen, Macon lapsed into a coma and suffered brain damage.  Macon is now a non-verbal, non-responsive quadriplegic.

Chicago Trust Company (Chicago Trust) filed a medical malpractice/products liability complaint on behalf of Macon's estate against, 
inter
 
alia
, the Hospital.  The complaint alleged the Hospital failed to provide adequately trained staff members and failed to operate the ventilator properly.

During the course of discovery, Chicago Trust requested documents from the Hospital.  The Hospital filed its objections to this request, along with a privilege log, which identified 28 documents withheld from production under the Medical Studies Act (see 735 ILCS 5/8-2101 
et
 
seq.
 (West 1992 & Supp. 1997)) and the attorney-client privilege (see 134 Ill. 2d R. 201(b)(2)).

Of these 28 documents, the trial court eventually ordered the Hospital to produce 13 of them.  The Hospital later waived its privilege claims on four of these 13 documents.  The parties dispute nine documents, two of which are duplicates.

Document 2--dated August 18, 1995, and entitled "Situational Report"--was authored by Lisanna Jose, a respiratory therapist at the Hospital.  This document describes Jose's conduct on the date of Macon's accident.

Document 4--dated August 19, 1995, and entitled "Incident Report"--was authored by Corazon Allegre, a registered nurse at the Hospital, and an unidentified person named Maureen Moravitz.  This document describes Allegre's conduct on the date of Macon's accident and orders the person completing it to "RETURN TO DEPT. OF RISK MANAGEMENT."  Macon's inpatient notes, written by a Dr. Campos, state: "Aware of incident report and accident occurred last night."

Document 5/attachment 3--dated September 5, 1995, and entitled "MEMORANDUM RE: 
VENTILATOR CIRCUITS WITH IN-LINE NEBULIZERS
"--was authored by Dr. Phillip Bodenstab, the Hospital's Medical Director of Respiratory Care.  This document, addressed to nine doctors and "All Department Chairpersons," notifies its recipients that ventilators may disconnect during certain procedures and advises preventative measures. 

Document 5/attachment 4--dated August 30, 1995, and entitled "
GUIDELINES WHEN USING PARALYTIC AGENTS FOR MECHANICAL VENTILATION
"--was authored by Dr. Corey Franklin, the Hospital's Director of MICU.  This document, addressed to physicians, nurses, respiratory therapists, and pharmacists, provides tips for patient care during ventilation.

Document 5/attachment 5--dated September 6, 1995,--was authored by Dr. Franklin.  This document, addressed "To: MICU Attendings," S. Karno, and B. Reilly, reviews the scheduling rules governing attending physicians' rounds over weekends.

Document 18--dated September 1995, and entitled "Minutes of meeting re: action plan for three shifts"--has no named author.   This document, actually a series of three substantially identical two-page documents, apparently represents the minutes from three nursing "MINI-MEETING[S]" for three nursing shifts.  This document was signed and dated by several persons, probably nurses at the Hospital who attended these meetings.

Document 20--dated September 7, 1995, and entitled "Memorandum to staff re: action plan"--was authored by Dr. Frank Brown, Director of the Hospital's Division of Respiratory Care.  This document, addressed to the "RESPIRATORY THERAPY STAFF," describes the corrective action initiated by the Respiratory Care Division to provide safe ventilation.

Document 22 is the same as document 5/attachment 3.

Document 26 is the same as document 5/attachment 4.

The trial court made a series of rulings regarding these documents, allowing the Hospital to supplement its privilege log and to amend its supporting affidavits.  

The Hospital supported its assertions with an affidavit from Dr. Larry J. Goodman (Goodman), Medical Director of the Hospital and Chairman of the Hospital Oversight Committee (HOC), and four affidavits from Shellie Karno (Karno), an associate administrator and attorney with the Hospital.

Goodman's affidavit described the HOC as "*** a committee of administrative personnel and senior attending physicians *** responsible for the various clinical departments' oversight functions that reviews significant patient care and systems issues ***."  The HOC "*** meets twice monthly and ad hoc for the purpose of reviewing patient care, systems issues and incidents in order to reduce patient mortality and morbidity ***."  Goodman said the HOC "*** reports its findings and recommendations for corrective action to the Cook County Hospital Quality Assurance Committee [QAC]."  Goodman said the incident reports in Macon's case were forwarded to the QAC.

According to Goodman, the incident reports "*** were prepared at the request of the [HOC]."  Goodman finally noted: 

"*** [T]hese [incident] reports were an integral part of the quality assurance process and part of the multiple Committee review process ***."

Karno's first affidavit echoed Goodman's affidavit, adding only:

"That at each phase of this [committee] process, the contents of the incident reports were analyzed, evaluated and discussed and recommendations were made regarding the contents of the incident reports."

Karno's second affidavit mirrored her first affidavit, except it identified the incident and situational reports in Macon's case as documents 1-5 in the Hospital's privilege log.

Karno's third affidavit did not substantively address the disputed documents, and only briefly mentioned documents 20 and 22: "*** Documents 19, 20 and 22 were the attachments to Document 21."

Karno's fourth affidavit addressed some of the disputed documents.  After describing her job as attorney for the Hospital, Karno said:

"*** [A]s the attorney for Cook County Hospital, I requested that reports, 
such
 
as
 those identified as Documents 1, 2, 3, 4 and 5, be prepared 
for the purpose of rendering legal opinions to the [HOC] regarding incidents such as this occurrence
."  (Emphasis added.)

Karno said, "I reviewed Documents 1, 2, 3, 4 and 5 and reported to the [HOC] regarding my 
legal
 opinions based on these Documents."  (Emphasis added.)  Karno also said:

"*** the [HOC] reviewed Documents 1, 2, 3, 4 and 5 and relied on those Documents in preparing its recommendations for action to be taken for the purpose of improving patient care or reducing mortality and morbidity."

This affidavit described documents 1, 2, and 5, but never mentioned document 18 or 26.  Additionally, this affidavit did not describe more fully documents 20 and 22.

The trial court made a complete ruling for each disputed document on July 8, 1997.  The trial court addressed each document separately, ordering production.

After the court ruled the Hospital still refused to produce the disputed documents.  On July 25, 1997, the trial court held the Hospital in contempt, entering a citation of $10 per day until the Hospital produced the documents.  This appeal followed. 

DECISION

The burden of establishing the applicability of a discovery privilege rests with the party seeking to invoke the privilege.  
Roach v. Springfield Clinic
, 157 Ill. 2d 29, 41, 623 N.E.2d 246 (1993).  

The standard of review depends on the question that was answered in the trial court.  Whether a discovery privilege applies is a matter of law, but the question of whether specific materials are part of a medical study is a factual question within that legal determination.  
Niven v. Siqueira
, 109 Ill. 2d 357, 368, 487 N.E.2d 937 (1985);  
Willing v. St. Joseph Hospital
, 176 Ill. App. 3d 737, 744, 531 N.E.2d 824 (1988).

Here, the trial judge was presented with five affidavits.  She proceeded to make detailed factual findings in an effort to determine whether the contested documents are part of the HOC's medical study.  The question before us is whether the trial judge's findings were against the manifest weight of the evidence.  See
 
Menoski v. Shih
, 242 Ill. App. 3d 117, 123, 612 N.E.2d 834 (1993). The Hospital contends the Medical Studies Act  and the attorney-client privilege shield certain documents from Chicago Trust's discovery request.

1.  
The Medical Studies Act Privilege

The Medical Studies Act (the Act) provides:

"Information obtained.  All information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, or other data of *** committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees, or their designees (but not the medical records pertaining to the patient) used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care ***, shall be privileged, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, [and] the evaluation and improvement of quality care ***."  735 ILCS 5/8-2101 (West Supp. 1997).

The Act further provides:

"Admissibility as evidence.  Such information, records, reports, statements, notes, memoranda, or other data, shall not be admissible as evidence, nor discoverable in any action of any kind in any court or before any tribunal, board, agency or person.  The disclosure of any such information or data, whether proper, or improper, shall not waive or have any effect upon its confidentiality, nondiscoverability, or nonadmissibility."  735 ILCS 5/8-2102 (West 1992).

"The purpose of this legislation is not to facilitate the prosecution of malpractice cases."  
Jenkins v. Wu
, 102 Ill. 2d 468, 479, 468 N.E.2d 1162 (1984).  "The purpose of the Act is to encourage candid and voluntary studies and programs used to improve hospital conditions and patient care or to reduce the rates of death and disease."  
Niven
, 109 Ill. 2d at 366.  "The Act is premised on the belief that, absent the statutory peer-review privilege, physicians would be reluctant to sit on peer-review committees and engage in frank evaluations of their colleagues."  
Richter v. Diamond
, 108 Ill. 2d 265, 269, 483 N.E.2d 1256 (1985).

The Act protects against disclosure of the mechanisms of the peer-review process, including information gathering and deliberation leading to the ultimate decision rendered by a hospital peer-review committee.  
Ekstrom v. Temple
, 197 Ill. App. 3d 120, 126, 553 N.E.2d 424 (1990); accord 
May v. Central Illinois Public Service Co.
, 260 Ill. App. 3d 41, 48, 633 N.E.2d 97 (1994); 
Zajac v. St. Mary of Nazareth Hospital Center
, 212 Ill. App. 3d 779, 789, 571 N.E.2d 840 (1991); 
Pritchard v. Swedish-American Hospital
, 191 Ill. App. 3d 388, 399, 547 N.E.2d 1279 (1989); 
Payne v. Nicholas
, 156 Ill. App. 3d 768, 779-80, 509 N.E.2d 547 (1987).  In other words, documents generated specifically for the use of a peer-review committee receive protection under the Act.  
Toth v. Jensen
, 272 Ill. App. 3d 382, 385, 649 N.E.2d 484 (1995); see
 
Stricklin v. Becan
, 293 Ill. App. 3d 886, 890, 689 N.E.2d 328 (1997)("generated during the course of the peer-review process");
 
Sakosko v. Memorial Hospital
, 167 Ill. App. 3d 842, 847, 522 N.E.2d 273 (1988)("initiated and used by a committee").

The Hospital divides the disputed documents into two groups: "incident or situational reports and information reflecting the HOC process."  Documents 2 and 4 (incident and situational reports) probably were generated before the HOC began its deliberations.  Documents 5, 18, 20, 22, and 26 (information reflecting the HOC process) probably were generated after the HOC completed its deliberations.  In other words, the disputed documents fall into pre-deliberation and post-deliberation categories.  

The Act does not protect against disclosure of information generated before the peer-review process began.  
Grandi
 v. Shah
, 261 Ill. App. 3d 551, 556, 633 N.E.2d 894 (1994); 
May v. Wood River Township Hospital
, 257 Ill. App. 3d 969, 976, 629 N.E.2d 170 (1994); 
Ekstrom
, 197 Ill. App. 3d at 129; 
Marsh v. Lake Forest Hospital
, 166 Ill. App. 3d 70, 76, 519 N.E.2d 504 (1988).

The Illinois Supreme Court's latest pronouncement on the Act supports this rule.  In 
Roach
, the parents of a child with birth defects brought a medical malpractice claim against the hospital where the child was born and against the mother's obstetricians.  The child's birth defects allegedly resulted from problems with the mother's anesthesia.  After the child's birth, the hospital's chief of anesthesiology spoke with a nurse and a nurse anesthesiologist about the cause of the defects.  These conversations occurred well before the monthly meeting of the hospital's peer review committee.  The parents sought to compel the chief of anesthesiology to disclose the content of these conversations.  The hospital objected, citing the Act.

The court held: "*** where the committee is one comprised of the hospital's medical staff, the committee must be involved in the peer-review process before the privilege will attach."  
Roach
, 157 Ill. 2d at 40.  The court reasoned:

"If the simple act of furnishing a committee with earlier-acquired information were sufficient to cloak that information with the statutory privilege, a hospital could effectively insulate from disclosure virtually all adverse facts known to its medical staff, with the exception of those matters actually contained in a patient's records."  
Roach
, 157 Ill. 2d at 41.

The court concluded such a result would subvert the purpose of the Act by protecting hospitals from medical malpractice claims.  
Roach
, 157 Ill. 2d at 41-42.  The court said: "*** the statute was never intended to shield hospitals from potential liability."  
Roach
, 157 Ill. 2d at 42 (citing 
Marsh
, 166 Ill. App. 3d at 76).

Documents 2 and 4 are both form documents prepared close in time to Macon's accident.  Document 2 was written on the same day Macon became disconnected from the ventilator, and document 4 was written the next day.  Dr. Campos referred to document 4 in Macon's inpatient notes.  Further, while document 2 did not list a specific destination, document 4 said "RETURN TO DEPT. OF RISK MANAGEMENT."  Were D
ocuments 2 and 4 prepared before the HOC, which meets "twice monthly and ad hoc," began gathering information?  There is no way to tell.  Neither Goodman's nor Karno's affidavits tell us when the HOC met to discuss Macon's accident.  Nor do we know when the HOC began or ended its review.

Goodman's only affidavit, standing alone, does not establish the privilege for documents 2 and 4.  Goodman said: "*** [T]he incident reports in this case were prepared at the request of the [HOC]."  Karno's first affidavit repeated this statement.  Karno's second affidavit also repeated this statement and added, "*** incident and situational reports were prepared regarding this case at the request of the [HOC]."  The trial judge was given no facts concerning who made the request, when it was made, or where it was made.  The statement in the affidavits is pure conclusion, bereft of facts.

Karno's third affidavit did not discuss documents 2 and 4, but in her fourth affidavit Karno said: "*** [A]s the attorney for Cook County Hospital, I requested that reports, 
such
 
as
 those identified as [documents 2 and 4] be prepared for the rendering of 
legal
 opinions to the [HOC] regarding incidents 
such
 
as
 this occurrence."  (Emphasis added.)  Karno also said she reported her legal (not medical) opinions to the HOC
 after reviewing documents 2 and 4.  Obviously, legal advice is not a goal of the protection offered by the Act.

While Goodman and Karno make identical conclusory statements in their first affidavits, Karno's account changes in her fourth attempt to support the Hospital's privilege.  She initially said the HOC specifically requested incident reports, including documents 2 and 4.  Later, she said she requested reports "such as" documents 2 and 4 to help her formulate legal opinions.  Goodman's affidavit and Karno's fourth affidavit contradict each other.  And the Hospital has supplied no affidavits from Jose, Allegre, and Moravitz--the authors of documents 2 and 4, the people in the best position to resolve this conflict.

The trial court found the documents belie Karno's implication that she requested these specific documents, as well as Goodman's assertion the HOC requested these documents.

The Hospital relies on 
Flannery v. Lin
, 176 Ill. App. 3d 652, 531 N.E.2d 403 (1988).  In 
Flannery
, the court held a document prepared during a patient's admission and later presented to, and used by, a hospital's peer-review
 committee fell within the privilege.  
Flannery
, 176 Ill. App. 3d at 658.  While 
Flannery
 is authority for the Hospital's position, its vitality was drained by 
Roach
.  See 
Roach
, 157 Ill. 2d at 41 ("earlier-acquired information" furnished to peer-review committee is not cloaked by the Act's privilege).  

We looked at polygraph tests given to nurses as part of an internal hospital investigation in 
Marsh
, 166 Ill. App. 3d at 76.

We found no privilege:

"*** [T]he record shows that, at least in this instance, the investigation was undertaken by the hospital administration.  Given the potential risks involved, it does not seem that the administrators would be deterred from such an investigation simply because the result might subsequently be discoverable in a civil suit against the hospital."

See 
Dunkin v. Silver Cross Hospital
, 215 Ill. App. 3d 65, 68, 573 N.E.2d 848 (1991)("The reports are the same kind of incident reports which any business might have.")

The Act also does not protect against disclosure of the peer-review committee's recommendations after completion of the peer review process.  
Richter
, 108 Ill. 2d at 269; 
Willing
, 176 Ill. App. 3d at 743; 
Gleason v. St. Elizabeth Medical Center
, 135 Ill. App. 3d 92, 95, 481 N.E.2d 780 (1985).

Documents 5 and 20 (which also encompass documents 22 and 26) demonstrate the Hospital's responses to, and recommendations after, Macon's accident.  These documents either describe ventilator problems or prescribe measures to solve these problems.

Although these documents had a wide audience, certainly wider than the HOC committee, disclosure does not waive the Act's privilege.  See 735 ILCS 5/8-2102; 
Sakosko
, 167 Ill. App. 3d at 846.  The trial judge was mistaken when she implied disclosure waives the Act's privilege.  Disclosure or not, the question is whether the HOC initiated, created, prepared, or generated the documents.  We see nothing in the affidavits which requires an affirmative answer.

These documents were distributed beyond the HOC: nine doctors and "All Department Chairpersons" (document 5/attachment 3); "PHYSICIANS," "NURSES," "RESPIRATORY THERAPISTS," and "PHARMACY" (document 5/attachment 4); "MICU Attendings" (document 5/attachment 5); and "RESPIRATORY THERAPY STAFF" (document 20).  In fact, Goodman, the Chairman of the HOC, is not listed specifically as an addressee in any of these documents.  The broad dissemination of these documents--along with their descriptive/prescriptive content--is evidence they were not generated during the peer-review process, but were created as a result of that process.  The documents did not "belong" to the HOC.  
Grandi
, 261 Ill. App. 3d at 556.

Although the Hospital concedes documents 5 and 20 represent the results of the HOC's peer-review process, it contends such results still fall under the Act.  The hospital relies on our recent opinion in 
Doe v. Illinois Masonic Medical Center
, No. 1-96-4072 (June 1, 1998), equating the privileged protocols in 
Doe
 with the HOC's responses and recommendations here.

We read 
Doe
 differently.  In 
Doe
, we held the protocols governing a medical study were privileged under the Act.  In that context, a protocol is "*** the plan of a scientific
 or medical experiment or treatment ***."  Webster's Third International Dictionary 1824 (1981).  Obviously, the plan for a medical study would come before the study, not as a result of the study, and drives the operation of the study.  
Doe
 provides no support for the Hospital.

Regarding document 18, the trial court denied the Hospital's privilege claim because the Hospital failed to offer any support for a privilege.  None of the affidavits mentioned this document.

When a trial court finds a document at issue was initiated, created, prepared, or generated by a peer-review committee, it should be considered privileged under the Act, even though it was later disseminated outside the peer-review process.  If, however, a document was created in the ordinary course of the hospital's medical business, or for the purpose of rendering legal opinions, or to weigh potential liability risk, or for later corrective action by the hospital staff, it should not be privileged, even though it later was used by a committee in the peer-review process.  

The Hospital seems to be saying its HOC can invoke the Act's protection by declaring in advance that all incident documents prepared by the Hospital staff are part of the peer-review process.  The Hospital's position goes too far.  Such a policy, if effective, would swallow the rule.  The Act would not create exceptions to disclosure.  It would make everything confidential, except for the patient's own medical records.

We believe a trial court's proper course, followed here, is to examine each document at issue to determine whether it, specifically, has been made part of the peer-review process.  As it does so, the court should keep in mind that the simple act of stamping the word "confidential" on a piece of paper does not, in itself, invoke the protection of the Act.  The trial judge must be told how, when, and why the stamp was used.

In this case, every piece of paper at issue has been stamped "confidential."  The trial judge was not told who put the stamp on the papers, when it was done, or under what circumstances.  The trial court properly discounted the import of the stamp.

We conclude the trial court did not abuse its discretion when it found the Act's privilege did not justify refusal to produce the contested documents.

2.  
The Attorney-Client Privilege

Supreme Court Rule 201(b)(2) provides:

"All matters that are privileged against disclosure on the trial, including privileged communications between a party or his agent and the attorney for the party, are privileged against disclosure through any discovery procedure.  Material prepared by or for a party in preparation for trial is subject to discovery only if it does not contain or disclose the theories, mental impressions, or litigation plans of the party's attorney."  134 Ill. 2d R. 201(b)(2).

"The definition and application of the attorney-client privilege have been explained as follows: (1) where legal advice of any kind is sought; (2) from a professional legal adviser in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal adviser; (8) except the protection may be waived."  
In re Grand Jury January 246
, 272 Ill. App. 3d 991, 996, 651 N.E.2d 696 (1996)(citing 
People v. Adam
, 51 Ill. 2d 46, 48, 280 N.E.2d 205 (1972)).

S
ee also 
Sakosko
, 167 Ill. App. 3d at 847.
 

This privilege also extends to communications between an insurer and an insured, where the insurer has a duty to defend.  
People v. Ryan
, 30 Ill. 2d 456, 461, 197 N.E.2d 15 (1964); 
Buckman v. Columbus-Cabrini Medical Center
, 272 Ill. App. 3d 1060, 1066, 651 N.E.2d 767 (1995); 
Hyams v. Evanston Hospital
, 225 Ill. App. 3d 253, 257-58, 587 N.E.2d 1127 (1992). 
Claxton v. Thackston
, 201 Ill. App. 3d 232, 235, 559 N.E.2d 82 (1990); 
Ekstrom
, 197 Ill. App. 3d at 130.  In these cases, the party asserting the privilege must prove:

"(1) the identity of the insured; (2) the identity of the insurance carrier; (3) the duty to defend the lawsuit; and (4) that a communication was made between the insured and an agent of the insurer."  
Rapps v. Keldermans
, 257 Ill. App. 3d 205, 212, 628 N.E.2d 818 (1993).

In its brief, the Hospital asserts the attorney-client privilege only for documents 2 and 4, although its privilege log also listed document 5 as subject to this privilege.  The Hospital contends the insurer-insured privilege applies to documents 2 and 4 because the Hospital is a self-insurer.

To support its contention, the Hospital offers Karno's fourth affidavit, in which she said: she served as the Hospital's attorney, investigating incidents and offering legal advice to the HOC; she requested "reports, such as" documents 2 and 4 "be prepared for the purpose of rendering legal opinions" to the HOC; and she reviewed documents 2 and 4 in rendering her legal opinions.

Karno's affidavit fails to support the attorney-client privilege.

Document 2--"Situational Report"--was prepared by Lisanna Jose, a respiratory therapist at the hospital.  Document 4--"Incident Report"--was prepared by Corazon Allegre, a registered nurse at the hospital, and someone named Maureen Moravitz.  Document 4 also notes the person(s) completing it should "RETURN TO DEPT. OF RISK MANAGEMENT."

Karno said she relied on these reports in formulating her legal opinions, but she did not indicate Jose, Allegre, and Moravitz were her clients when they wrote and transmitted the documents.  Although Jose and Allegre later were named as defendants in Chicago Trust's second amended complaint, Karno did not say she represented them when they prepared the documents.  (The record on appeal contains an answer to this complaint only from Puritan-Bennett Corporation, a products liability defendant.)  We see nothing in this record that indicates Jose, Allegre, or Moravitz is asserting an attorney-client privilege.

Karno's client was the Hospital, a municipal corporation.  Notably, the Hospital does not contend Jose and Allegre were part of the corporate control group whose communications were subject to the corporate attorney-client privilege.  See 
Hyams
, 225 Ill. App. 3d at 253; 
Claxton
, 201 Ill. App. 3d at 236-37.  Jose and Allegre were mere employees, and Cook County has said, "Any employee who desires to retain additional counsel may do so at his or her own expense."  Cook County, Ill. Ordinance 22-22 (1980).    

Additionally, documents 2 and 4 were not addressed to or prepared by Karno.  Document 2 does not indicate an addressee, and Document 4 lists "DEPT. OF RISK MANAGEMENT" as the intended addressee.  Karno's affidavit does not describe this risk management department or her role in it.

In 
Sakosko
, a hospital asserted the attorney-client privilege with regard to several documents, including two letters from its risk management consultant to its risk manager outlining meetings of the risk management committee.  The court said:

"The purpose of the risk management committee is to review, investigate, evaluate and dispose of professional liability claims against defendant [hospital].  Present at meetings of the committee are top management officials of the defendant, the risk manager, the risk management consultant and defendant's legal counsel."  
Sakosko
, 167 Ill. App. 3d at 847.

The court held these documents were not privileged because they did not constitute communications between the hospital and its attorney.
  
Sakosko
, 167 Ill. App. 3d at 847.  

Similarly, documents 2 and 4 do not seek legal advice.  
In other words:

"The [documents] are not addressed to or prepared by [the Hospital's] attorney.  They are not memoranda of communications to, or advice from, defendant's attorney.  Instead, the exhibits contain primarily factual statements relating to plaintiff['s] 
medical
 conditions and prognoses."  
Sakosko
, 167 Ill. App. 3d at 847.

Finally, Dr. Campos referred to document 4 in Macon's inpatient progress notes, and document 4 itself said it was bound for the risk management department.  Although Karno indicates she kept these documents confidential, her claim is not credible, at least regarding document 4.  If the documents were given to persons outside the attorney-client relationship, any privilege that might have existed was waived.  The HOC claims it received the documents.

Karno's affidavit also fails to support the insurer-insured privilege.

As a self-insurer, the Hospital has "*** the exclusive right to defend any action or claim with counsel of its own choosing."  Cook County, Ill., Ordinance 22-22 (1980).  The Hospital also has a duty to indemnify its employees.  See Cook County, Ill., Ordinance 22-21 (1980).  As a result, the Hospital contends documents 2 and 4 were communications between an insurer (the Hospital) and insureds (Jose, Allegre, and Moravitz), and therefore subject to the attorney-client privilege.

In 
Buckman
, a self-insurer hospital asserted the insurer-insured privilege with regard to communications between a nurse and the hospital's attorney, who appeared for the nurse at a deposition.  The court declined to apply the insurer-insured privilege, and instead applied the attorney-client privilege.  
Buckman
, 272 Ill. App. 3d at 1066.  The court reasoned the hospital's attorney had acted directly as the nurse's attorney in rendering legal advice and services.  
Buckman
, 272 Ill. App. 3d at 1066.

Here, however, the Hospital cannot rely on such an argument because it has not shown Jose, Allegre, and Moravitz drafted documents 2 and 4 specifically to help Karno render legal advice to them.  More importantly, the insurer-insured privilege, as an offshoot of the attorney-client privilege, applies when:

"*** the insured may properly assume that the communication is made to the insurer 
for the dominant purpose of transmitting it to an attorney for the protection of the interests of the insured
."  (Emphasis added.)  
Ryan
, 30 Ill. 2d at 461.

See 
Rapps
, 257 Ill. App. 3d at 212; 
Hyams
, 225 Ill. App. 3d at 257; 
Claxton
, 201 Ill. App. 3d at 235-36.

Despite Karno's standing order to the Hospital staff requesting "reports, such as" documents 2 and 4, Karno stated she requested these documents "*** for the purpose of rendering legal opinions to the [HOC] regarding incidents such as this occurrence."  The Hospital has not shown these documents were drafted by Jose, Allegre, and Moravitz in order to protect their own interests.  

The trial court correctly overruled the Hospital's objections based on the attorney-client privilege, and its corollary, the insurer-insured privilege.

3.  
Contempt

"A contempt citation is an appropriate method for testing the propriety of a discovery order."  
Flannery
, 176 Ill. App. 3d at 655.  However, as noted by the trial court, the Hospital was not contemptuous of the court's authority.  The Hospital's refusal was made in good faith.  It merely sought appellate review of its unsuccessful assertions of privilege.

The contempt order is vacated.  See 
People ex rel. Birkett v. City of Chicago
, 292 Ill. App. 3d 745, 756, 686 N.E.2d 66 (1997).

CONCLUSION

The trial court correctly overruled Cook County Hospital's objections to producing the nine disputed records.  The contempt order is vacated.  We return the sealed documents to the trial court for proceedings consistent with this order.

REMANDED.

CERDA, P.J. and McNAMARA, J., concur.